Syllabus.

THOMAS H. DONAGHY, defendant below appellant, plaintiff in error, *vs.* THE STATE OF DELAWARE, plaintiff below respondent, defendant in error.

1. STATUTES—CONSTRUCTION—EJUSDEM GENERIS.

The doctrine of *ejusdem generis* is a rule of statutory construction that, where general words follow the enumeration of partciular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated.

2. CRIMINAL LAW—JURISDICTION—CONSTRUCTION OF CONSTITUTIONAL PROVISION.

*Const. Art.* 4, § 30, provides that the General Assembly may by law give to any inferior courts by it established or to be established, or to one or more justices of the peace, jurisdiction of assaults and batteries, keeping without a license a public house of entertainment, etc., retailing or selling without license or on Sunday, or to minors, intoxicants contrary to law, the carrying of a concealed deadly weapon, disturbing meetings held for the purpose of religious worship, nuisances, and such other misdemeanors as the General Assembly may from time to time, with the concurrence of two-thirds of all the members elected to each house, prescribe, and that the General Assembly may by law regulate the jurisdiction and provide that the proceedings shall be with or without indictment by grand jury or trial by petit jury, and may grant or deny the privilege of appeal to the Court of General Sessions, but that there shall be an appeal to such court in all cases in which the sentence shall be imprisonment exceeding a month or fine not exceeding one hundred dollars. *Held,* that there was no similarity between the specific crimes mentioned, and that the doctrine of *ejusdem generis* did not apply in the construction of the section, the phrase "such other misdemeanors as the General Assembly may prescribe" meaning "other misdemeanors such as the General Assembly may prescribe," since the doctrine does not apply where the specific words signify subjects greatly different from one another.

3. CRIMINAL LAW—APPEAL—AMOUNT IN CONTROVERSY.

In prosecutions in the Municipal Court of Wilmington under the Nonsupport Act (*Rev. Code* 1915, §§ 3034, 3035, 3037) for nonsupport of a minor child, in every case where the payments imposed upon accused would, during the continuance of his bond, amount to at least one hundred dollars, he is entitled to an appeal, under *Const. Art.* 4, § 30.

4. CRIMINAL LAW—JURISDICTION—MUNICIPAL COURTS—CONSTITUTION.

The holding that *Const. Art.* 4, § 30, providing that the General Assembly may give to inferior courts jurisdiction of assaults and batteries, etc., and other misdemeanors, was not a limitation on the power of the General Assembly to give to the Municipal Court of the City of Wilmington jurisdiction of the criminal matters contained in the Nonsupport Act, does not violate *Article* 4, § 20, giving the Legislature power to change the subject-matter to be adjudicated in the courts of the state of superior jurisdiction, since *Section* 20 does not limit the power of the Legislature to alter the jurisdiction of any existing inferior court by giving it jurisdiction of other misdemeanors than those enumerated in *Section* 30.

5. CRIMINAL LAW—JURISDICTION—MUNICIPAL COURTS.

The Municipal Court of the City of Wilmington has jurisdiction of the criminal matters contain in Nonsupport Act.

6. Criminal Law—Appeal and Error—Character of Appeal.

An appeal effects a removal of the cause to another tribunal, and involves a hearing *de novo* on both facts and law, as distinguished from a writ of error, or *certiorari*, whereby only questions of law are subject to re-examination.

7. Parent and Child—Procedure on Appeal in Nonsupport Prosecutions.

By Nonsupport Act, giving the Municipal Court of Wilmington jurisdiction of the criminal matters involved, subject to the right of accused to appeal as provided by law in other cases, the duly established procedure of the Municipal Court was adopted for the trial of cases arising under the Nonsupport Act, including an information there filed in place of an indictment, and the method of taking appeals from the judgments of the 'Municipal Court in cases which such court has jurisdiction to hear and determine.

8. Parent and Child—Nonsupport—Prosecution—Appeal—Statutes.

17 *Del. Laws, c.* 207, § 21, providing that, if in a prosecution in the Municipal Court of Wilmington for a nuisance affecting the public streets the defendant by affidavit claims a right of property in the street, further proceedings are stayed in the Municipal Court, and the clerk must transmit to the Court of General Sessions a copy of the record, and thereafter the case shall proceed in such court, does not provide a procedure for hearing appeals to the Court of General Sessions from the Municipal Court of Wilmington in cases arising under the Nonsupport Act.

9. Parent and Child—Nonsupport—Prosecution—Appeal—Statutes.

17 *Del. Laws, c.* 207, § 23, providing that a person against whom a judgment has been entered in the Municipal Court of Wilmington for violation of a city ordinance, and who has been committed for failure to satisfy the judgment, may appeal to the Superior Court, and that the filing of a transcript, modes of trial, and forms of proceeding shall be as in cases of appeal from the judgments of justices of the peace, provides a procedure for hearing appeals to the Court of General Sessions from the Municipal Court of the City of Wilmington in cases arising under the Nonsupport Act, and on appeal by a father convicted of nonsupport of his minor child in the Municipal Court, the Attorney General had a right to file in the Court of General Sessions a new information against the father.

10. Parent and Child—Nonsupport—Prosecution—Appeal—Variation—"Without Just Cause"—"Without Lawful Excuse."

In connection with nonsupport of a minor child, the statutory expression "without lawful excuse" is synonymous with the expression "without just cause," and in a prosecution in the Municipal Court of Wilmington for violation of Nonsupport Act by failing to support a minor child, it is not a variation that the information filed by the Attorney General on appeal in the Court of General Sessions used the expression "without lawful excuse," whereas the information in the Municipal Court used the expression "without just cause."

11. Parent and Child—Nonsupport—Prosecution—Information—Particularity in Alleging Offense.

An information in the Municipal Court of the City of Wilmington charging nonsupport of a minor child, in violation of the Nonsupport Act, must have the same degree of particularity in alleging the offense as is required of an indictment, for which it is a substitute.

12. PARENT AND CHILD—NONSUPPORT—PROSECUTION—APPEAL—VARIA-
TION—SPECIFICATION OF OFFENSE.

In a prosecution for nonsupport of defendant's minor child in violation of the Nonsupport Act, where the information in the Municipal Court of the City of Wilmington omitted the name of the child, the new information filed by the Attorney General in the Court of General Sessions on appeal was not demurrable because supplying the name of the child.

13. PARENT AND CHILD—FAILURE TO SUPPORT—STATUTE—"LAWFUL EXCUSE."

Where a wife, because of physical violence shown her by her husband, was afraid to come with her child to live with her husband in a place to which he invited her to come, and refused to do so, her refusal was no "lawful excuse" for her husband's failure to support the child, within the Nonsupport Act; the financial inability of the father to support his child being a lawful excuse for failure to support.

14. HUSBAND AND WIFE—HUSBAND'S RIGHT TO ESTABLISH DOMICILE.

A husband has a right to establish the family domicile, and in general it is the duty of the wife to live in that domicile, and she loses some of her rights to support in case she unreasonably refuses to do so, but there are reasons which may justify her in living elsewhere, of which fear of personal violence is one.

15. PARENT AND CHILD—NONSUPPORT—STATUTE—"DESTITUTE OR NECESSI-
TOUS CIRCUMSTANCES."

A child of three years, without property, is in "destitute or necessitous circumstances" within the Nonsupport Act when the father can, but does not, and the mother cannot, provide for the child's support, though both mother and child are in fact supported by the child's maternal grandfather, who is under no legal obligation to furnish such support.

BOYCE, J., dissenting.

## ON REARGUMENT.

16. PARENT AND CHILD—NONSUPPORT—PROSECUTION—EVIDENCE—RELE-
VANCY.

In a prosecution of a father for nonsupport of his minor child, in viola-
tion of the Nonsupport Act, testimony relating to the marital relations between defendant and his wife was immaterial and irrelevant, though the defense was that his wife refused to live with defendant, and she set up that it was on account of her fear of personal violence.

17. PARENT AND CHILD—NONSUPPORT—EVIDENCE.

In a prosecution of a father for failure to support his three-year-old child, in violation of the Nonsupport Act, the refusal to permit defendant's wife to answer the question, "Are you willing to take your child to your husband and live with him in a home provided for by him?" was proper, the only bearing the answer could have had being on the future support of the child, which was not the issue.

18. PARENT AND CHILD—NONSUPPORT—PROSECUTION—APPEAL.

In a prosecution for nonsupport of defendant's minor child, in violation of the Nonsupport Act, where, on appeal from the Municipal Court of Wil-
mington to the Court of General Sessions, the case was heard *de novo*, the judg-
ment on appeal was a new one, not limited to an affirmance or reversal, but the Court of General Sessions had a right to enter a different judgment,

including changes in the sentence and provisions for enforcing support of the child, and could rightly require the father to provide such support from a period anterior to the entry of its judgment, viz., from the time of the judgment in the Municipal Court.

**19. CRIMINAL LAW—CERTIORARI—CHARACTER OF PROCEDURE.**

On *certiorari* the Supreme Court finds whether the record does or does not contain error, and, if it does, grants new trial, or orders correction of the judgment, and, if it does not, simply affirms, and by mandate remits the case to the Court of General Sessions for such further proceedings as would have been proper had there been no writ of error.

**20. CRIMINAL LAW—CERTIORARI—QUESTIONS REVIEWABLE.**

On *certiorari*, questions of law and not of fact are reviewable; evidence being gotten into the record by a bill of exceptions, which is inappropriate to a writ of *certiorari;* but where the record, including the testimony taken below, as well as the parties, is before the Supreme Court, it has power to and should determine the questions raised by the assignments as if there had been a writ of error.

BOYCE, J., dissenting. PENNEWILL, C. J., dissenting in part.

(*February* 28, 1917.)

CURTIS, Chancellor, PENNEWILL, Chief Justice, and BOYCE, Associate Judge, sitting.

*James I. Boyce* for plaintiff in error.

*Josiah O. Wolcott*, Attorney General, and *Armon D. Chaytor, Jr.*, Deputy Attorney General, for defendant.

Supreme Court, No. 2, June Term, 1916.

CERTIORARI to the Court of General Sessions, New Castle County.

Thomas H. Donaghy was tried on an information, in the Municipal Court for the City of Wilmington, for non-support of his minor child. Adjudged guilty, sentenced to pay a fine, and ordered to pay a certain sum by monthly installments for the support of the child. He appealed to the Court of General Sessions.

The Attorney General filed a new information on appeal in the Court of General Sessions, No. 49, March term, 1915. The accused was tried, convicted and ordered to pay a smaller sum for support of the child and costs of prosecution. He brings *certiorari*. Judgment affirmed with directions. BOYCE, J., dissenting. PENNEWILL, C. J., dissenting in part.

Same case on demurrer to the information in the Court of General Sessions.  *Boyce*  , 99 *Atl.* 720.

The statute under which the accused was prosecuted is contained in the *Revised Code* 1915, and the pertinent sections are:

" *Sec.* 3034.   That any husband who shall, without just cause, desert or wilfully neglect or refuse to provide for the support and maintenance of his wife in destitute or necessitous circumstances, or any parent who shall, without lawful excuse, desert or wilfully neglect or refuse to provide for the support and maintenance of his or her legitimate or illegitimate child or children, under the age of sixteen years, in destitute or necessitous circumstances, shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine, not exceeding five hundred dollars, or by imprisonment with hard labor in such penal or reformatory institution of this state as may be determined upon by the court, for a period not exceeding one year, or both.   And it is hereby made the duty of the parent of any illegitimate child or children, under the age of sixteen years, to provide for the support and maintenance of such illegitimate child or children.

"*Sec.* 3035.   Proceedings under this act may be instituted upon complaint made under oath or affirmation by the wife or child or children, or by any other person, against any person guilty of either of the above-named offenses.   The Court of General Sessions, and the Municipal Court for the City of Wilmington shall have original and concurrent jurisdiction in all cases arising under this act, and unless the accused shall demand a trial by jury the trial shall in each case be by the Court without a jury, subject to the right of the accused to appeal as provided by law in other cases:  Provided, however, that the proceedings, under this act, in the Municipal Court for the City of Wilmington shall be without indictment by grand jury or trial by petit jury.     *   *   *

"*Sec.* 3037.   Before the trial, with the consent of the defendant, or at the trial, on entry of a plea of guilty, or after conviction, instead of imposing the penalty hereinbefore provided, or in addition thereto, the court in its discretion, having regard to the circumstances, and to the financial ability or earning capacity of the defendant, shall have the power to make an order, which shall be subject to change by the court from time to time, as circumstances may require, directing the defendant to pay a certain sum periodically to the wife, or the guardian, or custodian of the said minor child or children, or to an organization or individual approved by the court as trustee, and to release the defendant from custody on probation, upon his or her entering into a recognizance, with or without surety, in such sum as the court or a judge thereof in vacation may order and approve.   The condition of the recognizance shall be such that if the defendant shall make his or her personal appearance in court whenever ordered to do so, and shall further comply with the terms of such support, or of any subsequent modification thereof, then such recognizance shall be void, otherwise in full force and effect."

The information filed against the accused in the Municipal Court charged that he "did unlawfully without just cause, wilfully neglect to provide for the support and maintenance of his minor child under sixteen years of age, in destitute and necessitous circumstances, against," etc.

Counsel for the accused moved to quash the information, which motion was denied. Thereupon, after hearing the evidence, the Municipal Court adjudged the accused guilty and did order him to pay or cause to be paid to Frank Stout, trustee, of whom the court approved, the sum of six dollars per week for the support and maintenance of his minor child under sixteen years of age; and also, to appear personally in the said court whenever thereafter ordered to do so; and also, to comply with the terms of the order of support, or of any subsequent modification thereof; and also, that he be released from custody on probation upon entering into recognizance with surety to the State of Delaware, in the sum of five hundred dollars for compliance by him with the said order of support; and in addition to the foregoing order, did sentence him to pay a fine of two hundred dollars and costs of prosecution amounting to the sum of one hundred and eighteen and $^{84}/_{100}$ dollars.

On appeal to the Court of General Sessions, the information filed by the Attorney General, set forth the judgment of the Municipal Court, and charged the accused in six counts with various violations of the statute. The first charged that the accused "unlawfully and without lawful excuse did wilfully neglect to provide for the support and maintenance of his child, to wit, one Henry Donaghy, he, the said Thomas H. Donaghy being then and there a parent of the said Henry Donaghy, and the said Henry Donaghy being then and there the legitimate child of the said Thomas H. Donaghy, and being then and there a minor under sixteen years of age, and being then and there in destitute circumstances, against," etc.

The second was like the first, except that the child was alleged to be in "necessitous circumstances." The third charged that the accused "unlawfully and without lawful excuse did desert his child. * * * " The fourth charged that the accused "unlawfully and without lawful excuse, did refuse to provide for the support and maintenance of his child. * * * " The fifth was like the third, and the sixth was like the fourth, except that the child was alleged to be in "destitute circumstances."

Counsel for the accused moved to quash the information, and

each count thereof, on the grounds that it failed to correspond with the record of the prosecution below in the cause of action.  Motion refused.

Thereupon the accused demurred to the information and each of the counts thereof, which demurrer was overruled as to the first and second counts and sustained as to the third, fourth, fifth and sixth counts.  To the two counts sustained the accused pleaded not guilty and put himself upon the court for trial.

The prosecution on appeal came on for hearing before the Court of General Sessions.  At the close of the testimony, the court was requested on behalf of the accused, to find as matters of fact, in substance: That at the time the wife of the accused separated from him taking Henry Donaghy, the child, with her, and going home to her parents, he (the accused) was a resident of the city of Wilmington, Delaware; that from that date he moved to Atlantic City, New Jersey, with the intention of making that his legal residence and that his wife was requested to come there with him; that his wife has since refused to live with him at Atlantic City; that from and since the time of the separation, his wife has retained and enjoyed the custody and society of their minor child; that he has from and since that time been ready, willing and desirous to support his child, if he might have and enjoy its custody and society; that the child was not at that time and is not now in want of food, clothing or lodging, and is not likely to become a burden upon the State of Delaware.

The accused also prayed the court to find as matters of law, in substance:

That it was incumbent upon the state to prove beyond a reasonable doubt that any neglect, on the part of the accused, to provide for the support of Henry Donaghy, the child, was without lawful excuse; that the word "wilful" in the statute means with evil intent or legal malice or without reasonable ground for believing the act to be lawful; that likewise it is incumbent upon the state to show that the accused has means or property with which to support the child, or that he is in health with ability to earn money for the support of the child; that the accused may not be convicted under the statute when the child is fully provided for

by others; that the statute must be strictly construed, and if the child is receiving necessary food, clothing and lodging, there is no occasion for the state to enforce the statute in this case; that the child is improperly detained from the father, and that the improper detainment is a defense to the prosecution; and that, it being shown that the legal residence of the accused is in an adjoining state, he has committed no offense against the statute, if the child was detained in this state by the mother.

The court adjudged the accused guilty and made an order, similar to that made in the Municipal Court, that he pay the sum of four dollars instead of six dollars per week for the support and maintenance of his minor child, and that he pay the costs of prosecution amounting to the sum of twelve dollars and thirty-eight cents, the fine imposed below being omitted. The order so made was made retroactive and dates back, with respect to the weekly payments, to the date of the judgment of the Municipal Court.

Certiorari was sued out of the Supreme Court to the Court of General Sessions.

The exceptions taken to the record by the plaintiff in error are numerous, but they involve in general only three questions, stated in the majority opinion of the court.

ARGUMENT OF COUNSEL FOR PLAINTIFF IN ERROR.

The Municipal Court for the City of Wilmington has no jurisdiction in cases arising under *Chaper* 262, *Vol.* 27, *Laws of Delaware*.

*Article* 4, § 30, of the *Constitution* of the State of Delaware (1897) is recited.

Attention is directed to the scope and character of Sections 1, 2 and 4 of the statute in question.

The misdemeanor defined in the above sections of the statute is not one of "such other misdemeanors" as the General Assembly may by law give to any inferior court by it established, or to be established. The obvious basis of this contention is the doctrine of *ejusdem generis*, which is stated in 36 *Cyc.* 1119, 1120, and cases cited.

In the present instance it cannot be seriously contended that the framers of the Constitution meant to include any or all mis-

demeanors, for not only did they specify certain species of the genus which they had in mind, but they also qualified ''other misdemeanors'' not by the word ''any'' but by the word ''such.'' The first or primary definition of the word ''such'' in the Century Dictionary and Cyclopedia is ''of that kind''; ''of like kind or degree''; ''like''; ''similar''. A secondary meaning of the word is given as ''the same as previously mentioned or specified''; ''not other or different''. *In re Hull*, 18 *Idaho*, 475, 110 *Pac.* 256, 257, 30 *L. R. A. (N. S.)* 465.

Endlich on Interpretation of Statutes, §§ 405—407, gives numerous illustrations of the application of the doctrine of *ejusdem generis*. The only question is whether the misdemeanor defined by the statute in question is of the same genus as the misdemeanors specifically enumerated in *Article 4, § 30, of the Constitution*.

The misdemeanors therein enumerated are somewhat fewer than those enumerated in *Section 15* of *Article 6 of the Constitution of 1832*. Such summary trials are in derogation of the common law and not only must the proceedings be in strict conformity to the statute which authorizes them, but also must the jurisdiction over the subject matter be plainly and fully conferred. 12 *Cyc.* 321

The genus of which assaults and batteries, keeping without license a public house of entertainment, the unlawful selling of liquors, carrying concealed a deadly weapon, and nuisances are the species, may not be capable of precise limitation, but it cannot be held to include a misdemeanor such as is defined in *Section 1, c. 262, Vol. 27, Laws of Delaware.* The latter offense is distinguished from those enumerated in the Constitution: *First,* in that it is not of itself a breach of the peace and does not naturally or directly tend thereto; *second,* in that the penalty prescribed, including as it does a fine not exceeding five hundred dollars and imprisonment with hard labor for a period not exceeding one year, or both, makes the offense practically a felony in spite of its name; and *third,* in that the court has the power to make an order, in lieu of the above penalty or in addition thereto, directing the payment of unlimited sums of money for an unlimited period of time.

Assuming that the General Assembly, prior to the passage of the statute, had never exceeded its constitutional authority and

that all of the criminal matters theretofore placed under the juris-diction of inferior courts were within the meaning of *Article* 4, § 30, of the *Constitution;* nevertheless, the whole category of such criminal matters does not contain a single misdemeanor less cal-culated to affect the public peace and good order or more severe in its effect and penalty than that with which the plaintiff in error is charged. It is inconceivable that the framers of the Constitution intended to give to the General Assembly power to confer upon a mere magistrate, jurisdiction over a matter often involving thou-sands of dollars.

Upon an appeal to the Court of General Sessions from inferior courts under *Article* 4, § 30, of the *Constitution* of the State of Delaware, the Attorney General may not file a new information, or if he may, the new information must correspond with the original information in all matters of substance.

The Attorney General, as previously stated, filed in the Court of General Sessions a new and different information which the plaintiff in error first moved to set aside for irregularity. This motion was based on the assumption that the Attorney General had a right to file a new information just as the plaintiff below, in civil cases appealed from a justice of the peace to the Superior Court, has a right to, and must file a pro-narr. The objection to the information as filed by the Attorney General was that it did not correspond with the record of the prosecution below in the cause of action. In other words, disregarding the four counts to which a demurrer was later sustained by the Court of General Sessions, the new information differed from the infor-mation filed in the Municipal Court in two most important particulars:

[1] The information filed in the Municipal Court charged the plaintiff in error with having committed a certain offense "without just cause," whereas the information filed by the Attor-ney General charged that he had committed the offense "without lawful excuse."

[2] The information filed in the Municipal Court failed to describe or identify the person alleged to have been injured by the offense charged, whereas the information filed by the Attorney

General identified the person injured as one Henry Donaghy, and alleged him to be the legitimate child of the plaintiff in error.

The ruling of the learned Court of General Sessions dismissing the motion seemed to make an appeal capable of such hardship and injustice to an appellant, that counsel for the plaintiff in error demurred to the information filed by the Attorney General upon the grounds:

[1]  That upon an appeal to the Court of General Sessions from inferior courts under *Article 4, § 30, of the Constitution*, no new information may be filed by the Attorney General, but the case must be proceeded with upon the record of the court below.

An appeal is a method for the removal of a cause from a court of inferior to one of superior jurisdiction, unknown to the common law.  It is a civil law process, originally confined to causes of equity, ecclesiastical and admiralty matters to subject the fact as well as the law to review.  In this, it is distinguished from a writ of error or a writ of certiorari, which are both processes of common law origin and which remove nothing for re-examination but the law.  1 *Woolley*, 46; 1 *Bouv. Law Dict. tit. Appeal; Wiscart v. Dauchy*, 3 *U. S.* 321, 1 *L. Ed.* 619.

There have been in this state so few appeals in criminal cases from inferior courts to the Court of General Sessions that the question of what constitutes the lawful procedure has not come before the courts.  It is admitted that in the few cases which do exist the Attorney General has filed a new information based on the information filed below.  This practice has had for its supposed authority the case of *Pratesi v. the Mayor and Council of Wilmington*, 4 *Pennewill*, 258, 54 *Atl.* 694, but an examination of that supposed authority shows that the case was an appeal to the Superior Court from a judgment of the Municipal Court for the violation of a city ordinance and as such was expressly provided for by *Section 23, c. 207, Vol. 17, Laws of Delaware*.

A further examination shows that the nearest approach of any statutory provision governing the mode of procedure upon an appeal to the Court of General Sessions in criminal matters is upon an information in the Municipal Court for a nuisance affecting the public streets, lanes or alleys of the city where the party against

whom the same is filed claims a right of property.   *Section* 21, *c.* 207, *Vol.* 17, *Laws of Delaware.*

The method and nature of an appeal from summary convictions before justices of the peace in England are described in *Chapter* 4, *Vol.* 2, of the first American edition in *Chitty's Practice.* The "conviction," which is the record sent to the Sessions, contains the original complaint or information, the appearance, the arraignment, the evidence by which the justice arrives at his verdict, and the sentence imposed by the court.   This "conviction" is open to quashal for errors either in law or in fact and it is clear that an appeal gives the appellant any advantage which he might have had by certiorari and in addition thereto the added advantage of having the appellate court determine whether there are grounds for error in connection with the testimony.   The sole difference between an appeal and a certiorari is that the former constitutes a broader remedy provided only in certain cases.

So far as counsel for the plaintiff in error has been able to ascertain this is the first case appealed to the Court of General Sessions in which the definition or the description of the offense, as charged before the magistrate, has been substantially modified or amended by the Attorney General.   In the case of *Bradfield v. State,* 5 *Boyce,* 262, 92 *Atl.* 988, which was an appeal from the Municipal Court to the Court of General Sessions involving the same offense charged in this case, the new information filed by the Attorney General followed the exact wording of the original information in the statement of the offense.   The state can scarcely rely upon practice to support its new information and then disregard the practice as established in the Bradfield and other cases. There is no authority either at common law or under our statutes for the filing of a new information.

[2]   That the information filed by the Attorney General failed to correspond with the record of the prosecution below in the cause of action and raised issues which were not the issues before the Municipal Court.

Assuming for a moment that the case on appeal is properly *de novo* as to the pleadings, it is nevertheless true that the case is the same as the one upon which the judgment was entered below.

Even in civil appeals where the procedure is naturally relaxed, the pro-narr. must conform to the transcript. If it should appear that the pro-narr. failed to correspond with the record of the case below in the cause of action, it would be struck out on application. 2 *Woolley*, § 1438; *Townsend v. Steward*, 4 *Harr.* 94; *Norton v. Janvier*, 5 *Harr.* 346; *McDowell v. Simpson*, 1 *Houst.* 467.

In those states in which appeals in criminal matters vacate the judgment of the magistrate and open the whole case for trial *de novo* in accordance with a statute to that effect, an objection to the sufficiency of the complaint may be made for the first time on appeal  *Steuer v. State*, 59 *Wis.* 472, 18 *N. W.* 433; *People v. Belcher*, 58 *Mich.* 325, 25 *N. W.* 303; *State v. Howie*, 130 *N, C.* 677, 41 *S. E.* 291.

That an appellant is to be tried for one and the same offense in both the inferior and the appellate courts is obvious in principle and well settled. 12 *Cyc.* 342; 1 *A. & E. Enc. of Law*, 627; *Com. v. Blood*, 4 *Gray (Mass.)* 31; *Com. v. Phelps*, 11 *Gray (Mass.)* 72.

What were the changes made by the Attorney General and what was the effect of them? With regard to the substitution of the phrase "without lawful excuse" as used in the information filed in the Court of General Sessions for the phase "without just cause" as used in the original information, it might reasonably be urged that the two phrases are synonymous and that the issues raised thereunder would be identical, if the General Assembly had not seen fit to differentiate between these two phrases and to use them in contradistinction to each other.

Under the strict rulings properly applicable to criminal pleading, it might well be held that no offense was charged in the information filed in the Municipal Court, by reason of the failure to use proper words to negative the exception contained in the statute.

The insertion in the new information filed by the Attorney General of the name of the person alleged to be injured was held by the learned Court of General Sessions not to change the offense charged, but to set it out more specifically. The court said:

"If it could have any effect it would be to limit the scope of the evidence necessary to be met by the appellant and would be to his advantage rather than to his disadvantage."

It is respectively submitted that the appellant was unmistakably entitled to this advantage before any judgment of the Municipal Court could have been legally rendered against him. It was not to acquire advantages of which he had been deprived that the appellant went into the Court of General Sessions, but to seek a reversal of the judgment of the Municipal Court because he had been deprived of advantages secured to him by the fundamental principles of criminal law. Persons other than the defendant and particularly the persons injured are universally required to be alleged in criminal proceedings for the identification as well as the material description of the offense. *State v. Walker*, 3 *Harr.* 547; *State v. Pollock*, 105 *Mo. App.* 273, 79 *S. W.* 980; *State v. Irvin*, 5 *Blackf. (Ind)* 343; *Butler v. State*, 5 *Blackf. (Ind.)* 280; 1 *Chitty, Cr. Law*, *213; 3 *Whart. Cr. Law*, §2445; *Bac. Abr. Indict. G.* 2; 2 *Hawk. P. C. c.* 25, § 71; 10 *Enc. Pl. & Pr.* 505, 506.

*Brown v. Mayor of Mobile*, 23 *Ala.* 722, and *State v. Bitman*, 13 *Iowa*, 485, are exactly in point and state the unquestioned law. See, also, *Irving v. State*, 73 *Tex. Cr. Rep.* 615, 166 *S. W.* 1166.

The reason for this and other similar rules of pleading in criminal matters is stated in 1 *Bishop's Crim. Pro.* § 517 *et seq.*

What constitute "without lawful excuse" and "in destitute or necessitous circumstances" under the statute?

Assuming that said Municipal Court had jurisdiction in this case and that the information filed by the Attorney General was properly and regularly filed, nevertheless the Court of General Sessions erred when it refused to enter a judgment of not guilty on the grounds that the state had failed to show that the minor child of the plaintiff in error was "in destitute or necessitous circumstances" or that the plaintiff in error had neglected to support his child "without lawful excuse." Taking the latter phrase first, it is obvious that "without lawful excuse" means something. *State v. Langley*, 248 *Mo.* 545, 154 *S. W.* 713.

The state did not prove that the neglect of the plaintiff in error was "without lawful excuse."

The testimony of the plaintiff in error contradicts much of the testimony of Mrs. Donaghy; but assuming the testimony of the latter to be entirely true in every particular, it is nevertheless

submitted: *First*, that the plaintiff in error had a right to establish the domicile of the family; and *second*, that it was the duty of the wife to live in the domicile established by him. It is well settled that where a husband is ready and willing to take care of his wife and children, but the wife refuses to live with him and retains the custody of the children, the husband cannot be subsequently convicted of failing to support the children. *People ex. rel. Mueller v. Mueller*, 164 *App. Div.* 386, 150 *N. Y. Supp.* 204; *People v. Rubens*, 92 *N. Y. Supp.* 121. The state can cite no authority under the so-called Uniform Non-Support Act or under the general poor laws, where it has been held that a father, who is willing, ready and desirous of supporting his child, is guilty of neglect to support that child by reason of the fact that he fails to support it, so so long as it is kept out of his custody.

A still more important question is the meaning of the phrase, "in destitute or necessitous circumstances" as used in the act. There are two lines of cases: the one holding that the father is guilty of a misdemeanor even though the wants of the child be amply supplied by relatives or friends; the other holding that the father cannot be convicted unless it be shown that the child is actually in destitute or necessitous circumstances. It is respectfully submitted that the latter line of cases is founded in good reason and justice and that the learned court below erred in holding the contrary. See *State v. Thornton*, 232 *Mo.* 298, 134 *S. W.* 519, 32 *L. R. A.* (*N. S.*) 841; *Dalton v. State*, 118 *Ga.* 196, 44 *S. E.* 977; *Baldwin v. State*, 118 *Ga.* 328, 45 *S. E.* 399; *Williams v. State*, 121 *Ga.* 195, 48 *S. E.* 938; *Mays v. State*, 123 *Ga.* 507, 51 *S. E.* 503; *Williams v. State*, 126 *Ga.* 637, 55 *S. E.* 480; *Richie v. Com.*, 23 *Ky. Law Rep.* 1237, 64 *S. W.* 979.

In the case before the court, the testimony shows that since the separation of the husband and wife, the child and its mother have lived with the mother's father, Charles G. Guyer, and that the child has not been in want of necessary food, clothing or lodging while under its grandfather's roof.

The other line of cases are: *State v. Stouffer*, 65 *Ohio St.* 47, 60 *N. E.* 985; *State v. Waller*, 90 *Kan.* 829, 126 *Pac.* 215; 49 *L. R. A.* (*N. S.*) 588.

Although the statute is the same, there is a marked distinction between the Kansas case and the case before the court, in that the husband in the former case did not offer his wife a home or ask her to come to any other place where he would support her.    In the Kansas case the court held that the statute in question was not a penal statute but remedial in its purpose, although it provided for the infliction of a severe penalty, and that the rule that penal statutes must be strictly construed was not applicable, but that the statue must be liberally construed in order that the legislative intent might be accomplished.

It may be noted that the court went so far as to hold that, even if the necessaries of life were amply supplied by the wife's own labor, the husband would still be guilty of a crime.    Under such reasoning what meaning can the phrase "in destitute or necessitous circumstances" possibly have?

The whole theory of punishment for crimes is based upon the injury done to society and not the individual.

The judgment of the Court of General Sessions should be reversed:

*First.*    Because the Municipal Court for the City of Wilmington was without jurisdiction in the cause.

*Second.*    Because it appears by the record that the Attorney General filed in the Court of General Sessions an information *de novo*.

*Third.*    Because it appears by the said record that the information so filed by the Attorney General failed to correspond with the record of the prosecution below in the cause of action.

*Fourth.*    Because it does not appear by the said record that the plaintiff in error wilfully neglected to provide for the support and maintenance of his minor child "without lawful excuse."

*Fifth.*    Because it does not appear by the said record that the minor child of the plaintiff in error was on May 1st, A. D. 1913, or has been at any time since then "in destitute or necessitous circumstances."

### ARGUMENT FOR THE STATE.

The first proposition of the plaintiff in error is:    The Municipal Court for the City of Wilmington has no jurisdiction in the cases arising under *Chapter* 262, *Vol. 27, Laws of Delaware*.

The argument in support of this proposition is founded entirely upon the doctrine of *ejusdem generis*.

It is submitted that the doctrine invoked does not apply:

(*a*)    Because the specific words assumed to limit and confine the general phrase "and such other misdemeanors as the General Assembly may from time to time  *  *  *  prescribe" have no common analogy to each other.

(*b*)    Because from the whole constitution the intention appears that it was not intended to limit the legislative power of the General Assembly in the manner suggested.

The specific words assumed to limit and confine the general phrase "and such other misdemeanors as the General Assembly may from time to time  *  *  *  prescribe" have no common analogy to each other. *State v. Eckhardt*, 232 *Mo.* 49, 133 *S. W.* 321; *Jones v. State*, 104 *Ark.* 261, 149 *S. W.* 56, *Ann. Cas.* 1914*C*, 302; *Brown v. Corbin*, 40 *Minn.* 508, 42 *N. W.* 481; *McReynolds v. People*, 230 *Ill.* 623, 82 *N. E.* 945.

The only relation which the specific words bear to each other is that they are within that class of crimes known as misdemeanors. Within the class to which they all belong, they are of entirely different nature, and the punishments imposed respectively are to correct entirely different kinds of public wrongs, having entirely different characteristics.

Some of the offences specified are *mala prohibita* and some are *mala per se.* In this respect they are dissimilar. Some are common law crimes and others are purely statutory.

To be sure the specified offenses, were at the time the Constitution was promulgated, well known and recognized, but if that should be a classification which would prevent the General Assembly from extending or conferring jurisdiction upon inferior courts of all new misdemeanors which might be created because of the growing complexity of society or because of the ingenuity of criminals then the jurisdiction of all new misdemeanors would, regardless of their nature, have to be conferred upon the Court of General Sessions.

Nor can the enumerated offenses be classified as "petty misdemeanors." There are only two classes of crime known

to the law of England or Delaware and they are felonies or misdemeanors.

Nor can the offenses specified fairly be called, as a class, "petty misdemeanors," even if there was such a classification because some are inherently serious.

It is argued that the word "such" in the clause "and such other misdemeanors as the General Assembly from time to time * * * prescribe" is used to qualify the word "misdemeanors." The word "such" is both an adjective and a pronoun. If it had been the intention of the convention to qualify the word "misdemeanors" with the word "such", they could and probably would have used it in such juxtaposition as to indicate that intention, and would probably have written the clause "and other such misdemeanors." Century Dictionary also defines "such" as:

"II. Pronoun. Such a person or thing; more commonly with a plural reference, such persons or things; by ellipsis of the noun. 'Such as sit in darkness and in the shadow of death.'"

The word "such" is such in conjunction with the word "as" in lieu of the word "that" and the clause might as readily have been written and as easily read "and other misdemeanors that the General Assembly may * * * prescribe."

Within the rule laid down above there is lacking in the specified offenses that similarity which makes them of such a class having such a common analogy as to persuade that it was the intention to limit the natural significance and meaning of the general words "such other misdemeanors as the General Assembly may from time to time * * * prescribe" or confine such phrase beyond its natural and usual meaning.

From the whole Constitution it is apparent that the general legislative power with respect to the jurisdiction of inferior courts was not intended to be limited as suggested by the plaintiff in error. In addition to the case of State v. Eckhardt, supra, 2 Lewis' Sutherland on Statutory Construction § 437, announces the qualifications of the doctrine ejusdem generis:

The ordinary meaning of the phrase "and such other misdemeanors as the General Assembly may from time to time * * *

prescribe'' is broad and unlimited except in three particulars: (1) That jurisdiction can never be conferred on inferior courts except by a two-thirds vote of the members of the General Assembly; (2) Jurisdiction can never be conferred upon an inferior court of a crime deemed a felony; and (3) The General Assembly cannot prohibit or prevent an appeal in any case where the punishment exceeds one month's imprisonment or one hundred dollars fine.

From an examination of the whole constitution it is evident that the Constitutional Convention intended to give to the General Assembly very broad powers with respect to the jurisdiction of courts. *Section* 1, *Article* 2, and *Section* 20, *Article* 4.

The convention was not satisfied with expressly vesting the general legislative power in the General Assembly (*Section* 1, *Article* 2) but to emphasize the extent of that power over the jurisdiction of the constitutional courts, expressed itself as in *Section* 20, *Article* 4. It will be borne in mind that the clause ''and such other misdemeanors as the General Assembly may from time to time * * * prescribe'' and the proviso that there should be an appeal to the Court of General Sessions when the punishment exceeds one month imprisonment or one hundred dollars fine, are new to the Constitution of 1897.

The general words which give the General Assembly power to invest inferior courts with jurisdiction in any misdemeanor are a corollary to the express power of the General Assembly to repeal or alter the jurisdiction of the constitutional courts. The three qualifications of the general power mentioned are indicative that they were the only limitations intended to be placed upon the General Assembly. It can hardly be urged that while the General Assembly had power, with a concurrence of two-thirds of its members, to create any inferior court (*Section* 1, *Article* 4) and had full power to repeal or alter any law giving jurisdiction to the Court of General Sessions and though it could divest, under the last mentioned power, the Court of General Sessions of jurisdiction in all misdemeanors, it could not invest one of the inferior courts created by it with jurisdiction of such offenses.

''The people in framing the Constitution committed to the Legislature the whole law-making power of the state which they did not expressly or

impliedly withhold. Plenary power in the Legislature, for all purposes of civil government, is the rule." *State v. Fountain,* 6 *Pennewill,* 520, 529, 69, *Atl.* 926, 930; *People v. Draper,* 15 *N. Y.* 532.

An appeal is not a common law remedy, but must look to some enactment for its existence. In this particular case it exists by reason of the provision of *Section* 30, *Article* 4, *of the Constitution.*

The foregoing provision of the Constitution was not contained in that of 1832, and makes its appearance first in the Constitution of 1897, and consequently there was no law or no practice established in this state with direct reference to this provision. Since the Constitution of 1897 the General Assembly has provided no law governing the practice or procedure in the event of appeals under the foregoing provision, and that practice has arisen from analogy to the practice on appeals from the Municipal Court for the City of Wilmington upon convictions for violation of a city ordinance. *Pratesi v. the Mayor and Council of Wilmington,* 4 *Pennewill,* 258, 54 *Atl.* 694.

The analogy between the practice under appeals taken by virtue of the constitutional provision with that of appeals to the Superior Court from a Municipal Court is the closest for which any provision for procedure is made and was the more readily followed because, due to the activity and importance of the Municipal Court and the frequency with which appeals had been previously taken from that court to the Superior Court, a practice was established which could be easily followed and which has been consistently followed in the Court of General Sessions in all cases upon appeal under the Constitution.

Practice in appeals provided for by statute and which was followed in the *Pratesi* case can only arise after an actual trial and judgment in the Municipal Court involving a sentence of imprisonment.

An examination of the records of the Court of General Sessions since 1897 shows the following appeals to have been taken: * * * (Twenty).

Except in the three appeals where a *nolle prosequi* was entered and another which was dismissed, there have been new informations filed in every appeal to the Court of General Sessions.

\

·An appeal in a criminal case is different from appeals in civil litigation. It differs in these respects: (*a*)   No evidence comes up; (*b*) new testimony is taken; (*c*) an independent judgment is rendered in the appellate court; (*d*) no mandate is sent back to the lower court.

The information below sets out an offense. Assume it was not set out with sufficient particularity yet it unquestionably described an offense. The information above described a similar offense with greater particularity. There was no apparent inconsistency between the two informations; they were in harmony. If there was no conviction in the lower court in an appeal case, or if the conviction was for an offense different from that tried in the appellate court, it is submitted the defendant should be required to set the fact up by way of plea and if the case goes to trial on the merits it is to be assumed that he waives the objection.

In criminal matters of this kind two remedies are open to the defendant:

[1]   Appeal where the upper court hears anew all evidence, not confining itself solely to the evidence below, and renders a judgment of its own.

. [2]   Certiorari, which brings up the record in the lower court for review for sufficiency in law. By analogy to the rule applicable to civil appeals from justices of the peace, the defendant should be required to elect which remedy he desires.

No prejudice has been done to the defendant in this case. If he had pleaded that the offense in the upper court was different from the offense in the lower court and had won on that plea, after hearing, he would have gone free. If on the other hand he had lost on that plea he would not have been prejudiced because then the fact would have been determined against him. Instead of taking his appeal, the defendant could have taken a writ of certiorari and attacked the judgment below because of defect in the information. If he had won on this his rights would have been secured, if he had lost, there would have been a judgment affirming the judgment below.

The General Assembly had already provided a procedure in a statutory appeal in criminal cases where defendants had been

imprisoned, and the *Pratesi* case established and defined that procedure. As has been shown that procedure was adopted and has been consistently adhered to in every appeal in the Court of General Sessions since the new Constitution. Until changed by the General Assembly, this practice should have all the force of statutory law of this state.

The Court of General Sessions and the Municipal Court have concurrent jurisdiction of the offenses in the non-support act. If a defendant should be brought before a justice of the peace he would be held to bail or committed to appear in either of said courts. If the defendant is held for the Court of General Sessions, he is indicted by the grand jury. If he is held for the Municipal Court and there convicted he takes his appeal to the Court of General Sessions and there an information is filed. By whichever route he may travel, he comes to the Court of General Sessions and the only difference in the procedure is in the fact that when his case comes directly from a justice of the peace he is indicted, when it comes by way of the Municipal Court he is informed against.

If we are right in maintaining the practice established, then the information in the Municipal Court had no place or part in the Court of General Sessions for the one statute which defines method of procedure on appeal from an inferior court, provides that the "filing of transcript, modes of trial and forms of proceeding shall be as in cases of appeal from the judgments of justices of the peace," upon which the transcript of the record only is filed.

The Constitutional Convention was perfectly cognizant of the fact that testimony is not preserved or taken in the inferior courts and when it provided for an appeal it meant an entirely different thing than that which is known to equity and admiralty jurisprudence where the whole record, pleadings and evidence, are taken to the appellate tribunal.

There is no warrant at the common law for trial upon a record in criminal cases, but there is and the courts are familiar with proceeding initiated by indictment or information.

The plaintiff in error, having elected to have his case heard upon the merits, complains because the information is more specific and certain than that in the court below, but the proceeding

being *de novo* as to pleading, not only upon practice but upon the reasons therefor, there is properly in the appellate court no information with which the comparison can be made.

The right of the accused to appeal as provided by law in other ·cases is preserved in the Non-Support Act. *Section 2, c. 262, Vol. 27, Laws of Delaware.* The General Assembly could not have meant the constitutional appeal already secured by the Constitution to defendants. At the time of the enactment of the statute, the right of appeal from the Municipal Court in criminal cases was provided for by *Section 23, of Chapter 207, Vol. 17, Laws of Delaware*, in which the procedure was specified. The law and practice being in this state it is respectfully submitted that the General Assembly knew of that law as to appeal and the established practice and by the provision in the Non-Support Act adopted the appeal and procedure thereon set out in said *section 23.*

Upon appeal to the Court of General Sessions the whole procedure, is *de novo*, pleading as well as evidence, for the purpose of trying the case upon its merits solely and not for the purpose of raising questions that could be more appropriately raised by certiorari.

The third proposition of the plaintiff in error is expressed in his question:

"What constitutes 'without lawful excuse' and 'in destitute or necessitous circumstances' under *Section 1, Ch. 262, Vol. 27, Laws of Delaware?*"

Under the authority of *State v. Quinn, 2 Penn. 339, 45 Atl.* 544, the phrase in the statute "without lawful excuse" need not have been alleged. But assuming for the sake of argument that the *Quinn* case is not applicable and the allegation is not surplusage it is submitted that the state showed that the failure of the plaintiff in error to support his child was "without just cause."

It is hardly necessary to point out the distinction between these cases, *viz.: State v. Langley, 248 Mo. 545, 154 S. W. 713*, and *Mueller v. Mueller, 164 App. Div. 386, 150 N. Y. Supp. 204*, and the one at bar. In both cases the father endeavored to take care of his children even to the point of bringing proceeding for their custody and in neither case does it appear that the father was to

Arguments.

blame for his wife's absenting herself. In the case at bar Donaghy inflicted physical abuse upon his wife so as to make her afraid of him and then would do nothing for his child, apparently using the child's dependent condition as a lever to compel his wife to return to him. We have not had access to *People v. Rubens*, 92 *N. Y. Supp.* 121.

Coming to the question of what is meant by the phrase "in destitute or necessitous circumstances" there are two lines of cases, upon which the plaintiff in error relies and those upon which the state relies.

The former arise under statutes, or constructions of statutes, distinctly different from ours whereas the latter cases construe and apply statutes precisely like ours except as to the term of imprisonment.

*State v. Thornton*, 232 *Mo.* 298, 134 *S. W.* 519, 32 *L. R. A.* (*N. S.*) 841, is founded upon a statute which is dissimilar to ours and which requires the neglect of the child to be such that "his life shall be endangered or his health shall have been or shall be likely to be permanently injured."

The Georgia cases are considered in the case of *State v. Bess*, 44 *Utah*, 39, 137 *Pac.* 829.

As to *Richie v. Comm.*, 23 *Ky. Law Rep.* 1237, 64 *S. W.* 979, it will hardly be contended that to make a father a violator of our statute that he must leave a child to "starve or freeze."

There are two decisions in particular upon statutes precisely like our own to which we desire to call particular attention. *State v. Waller*, 90 *Kan*, 829, 136 *Pac.* 215, 49 *L. R. A.* (*N. S.*) 588; *State v. Bess*, 44 *Utah*, 39, 137 *Pac.* 829; also *Brandel v. State*, 161 *Wis.* 532, 154 *N. W.* 997.

To the same effect are the cases cited in *State v. Bess*, *supra*, and also *State v. English*, 101 *S. Car.* 304, 85 *S. E.* 721, *L. R. A.* 1915F, 977.

It was not only shown that the plaintiff in error was without excuse for his neglect to support his child but, while possessing ample ability from an independent income and ability to work to support him, used the justifiable separation of his wife as a mere excuse and pretext, leaving his child dependent for the necessaries

of life upon the generosity of its grandfather, and the judgment of the court of General Sessions should be affirmed.

Curtis, Ch.: Numerous exceptions to the record were taken by the plaintiff in error, but as stated by his counsel in his brief they involve in general only three questions, which were there succinctly stated thus:

"1. Has the Municipal Court for the City of Wilmington jurisdiction in cases arising under *Chapter* 262, *Vol.* 27, *Laws of Delaware?*

"2. Upon an appeal to the Court of General Sessions from inferior courts under *Article* 4, § 30, *of the Constitution of the State of Delaware,,* may the Attorney General file a new information; and if so, in what respects may the new information differ from the information filed in the inferior court?

"3. What constitute 'without lawful excuse' and 'in destitute or necessitous circumstances' under *Section* 1, *Ch.* 262, *Vol.* 27, *Laws of Delaware?"*

This last point raises the question as to the sufficiency of the proof made in the trial of the information in the Court of General Sessions. The question of jurisdiction depends upon whether under the Constitution the Municipal Court could be given power to hear causes wherein a husband is charged with desertion and non-support of his wife and children. *Article* 4, § 30, *of the Constitution of the State of Delaware* provides:

"The General Assembly may by law give to any inferior courts by it established or to be established, or to one or more justices of the peace, jurisdiction of the criminal matters following, that is to say: assaults and batteries, keeping without license a public house of entertainment, tavern, inn, ale house, ordinary or victualing house, retailing or selling without license, or on Sunday, or to minors, wine, rum, brandy, gin, whiskey, or spirituous or mixed liquors, contrary to law, carrying concealed a deadly weapon, disturbing meetings held for the purpose of religious worship, nuisances, and such other misdemeanors as the General Assembly may from time to time, with the concurrence of two-thirds of all the members elected to each House prescribe.

"The General Assembly may by law regulate this jurisdiction, and provide that the proceedings shall be with or without indictment by grand jury, or trial by petit jury, and may grant or deny the privilege of appeal to the Court of General Sessions; provided, however, that there shall be an appeal to the Court of General Sessions in all cases in which the sentence shall be imprisonment exceeding one month, or a fine exceeding one hundred dollars."

[1] The doctrine of *ejusdem generis*, invoked by the defendant, is a rule of statutory construction to the effect that where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to

persons or things of the same general nature or class as those enumerated. As has been said, such a rule is based on the obvious reason that if it was intended that the general words should be used in their unrestricted sense, no mention would have been made of the particular classes. The particular application of the rule made by the defendant to the constitutional provision in question is that the word ''such'' is taken to mean ''like,'' or ''of the kind,'' and that the legislature can give to the Municipal Court, or any other inferior court jurisdiction of misdemeanors of the same kind or like those enumerated in the constitution, and the particular misdemeanor of failing to support a wife or child is not like any other misdemeanors so enumerated. The case of *Hull*, 18 *Idaho*, 475, 110 *Pac.* 256, 30 *L. R. A.* (*N. S.*) 465, does not sustain the position taken by the defendant, because the general phrase there construed was ''or any such,'' which is quite different from ''and such other.''

[2] But there is an important modification of the rule as to *ejusdem generis* very pertinent in this case. Obviously the doctrine does not apply where the specific words signify subjects greatly different from one another. See *State v. Eckhardt*, 232 *Mo.* 49, 133 *S. W.* 321, quoting a fair definition of the doctrine contained in 36 Cyc. 1119, 1120, also cited in the defendant's brief. See, also, *McReynolds v. People*, 230 *Ill.* 623, 82 *N. E.* 945; *Jones v. State*, 104 *Ark.* 261, 149 *S. W.* 56, *Ann. Cas.* 1914C, 302; *Brown v. Corbin*, 40 *Minn.* 508, 42 *N. W.* 481. Is there such a similarity or relationship between the several criminal matters mentioned in the constitutional provision under consideration? Clearly they are all crimes of the grade of misdemeanors, as distinguished from felonies. In other respects they are public wrongs, having no characteristics common to all of them. Some are breaches of the peace, *viz.*, assaults and batteries, and perhaps disturbing religious meetings, while none of the others are. Others relate to the enforcement of laws for collection of revenue, with only a remote bearing on peace and good order, *viz.*, keeping without license a tavern, and selling intoxicating liquors without license, or on Sunday, or to minors. Incidently this class of criminal matters relate to the promotion and enforcement of morality. Disturbances of religious meetings probably involve a breach of the peace, but a broader pur-

pose may be to secure to the individual freedom in his right to worship without annoyance. Nuisances are of many kinds, and do not necessarily involve a breach of the peace, and rarely do. Chiefly they relate to acts or conduct affecting injuriously the public health or morals. They differ in almost every way from every other criminal matter stated in the clause mentioned. It is clear, then, that there is no such general similarity between crimes that are distinctly breaches of the peace, those relating entirely to enforcement of revenue measures and those relating to the public health and morals, and so the rule of *ejusdem generis* does not apply here. The constitutional question as to jurisdiction is disposed of by the above consideration relating to the character of the above criminal matters without considering the punishments affixed thereto by the General Assembly.

It is not claimed that the Non-Support Act violates in any other way the constitutional provision above quoted, for it was enacted by a vote of two-thirds of the legislature, the offense created is not a felony, and an appeal was provided. As has been pointed out, the constitutional phrase ''such other misdemeanors as the General Assembly may * * * prescribe'' means naturally and according to the usual meaning, as well as from the context ''other misdemeanors such as the General Assembly may * * * prescribe,'' and if it had been intended to qualify the word ''misdemeanors'' to mean demeanors like those mentioned, the phrase used would naturally and properly have been ''and other such misdemeanors.''

[3] It is argued that the Constitutional Convention could not have intended to confer upon the Municipal Court for the City of Wilmington jurisdiction of offenses like the one before the court, because the accused would have no right of appeal in cases where neither imprisonment for a month nor a fine of one hundred dollars is imposed. We are of the opinion that in every case where the payments imposed upon the accused would, during the continuance of his bond, amount to at least one hundred dollars he would be entitled to an appeal. That would cover practically every case, and be in harmony with the spirit of the law.

[4, 5] In holding that there was not in the section of the

Constitution referred to a limitation upon the power of the General Assembly to give to the Municipal Court jurisdiction of the criminal matters contained in the Non-Support Act, no violence is done to the provisions of *Section* 20 of *Article* 4 *of the Constitution*, whereby a broad power is given to the legislature to change the subject matter to be adjudicated in the courts of the state of superior jurisdiction. By the last mentioned section, after defining, by general words the jurisdiction of the Court of Oyer and Terminer, Superior Court, Court of General Sessions, Orphans' Court and Court of Chancery, power was given to the General Assembly to repeal or alter the several jurisdictions in any matter, or giving any power to either of said courts. This provision in terms relates only to those of the superior courts there named, and theretofore established and then existing, and not to the then existing inferior courts, none of which was named, or to any such inferior courts as may hereinafter be created. Neither does it inferentially limit the power of the legislature to alter the jurisdiction of any existing inferior court, such as the Municipal Court of Wilmington, by giving to it jurisdiction of other misdemeanors than those enumerated in *Section* 30 of *Article* 4 *of the Constitution*, as herein above quoted, for obviously there is no relation between the two kinds of courts, and besides (which must be conclusive on the point) in another section of the same Constitution the power to alter the jurisdiction of such inferior courts was expressly given to the General Assembly. The conclusion is, then, that the Municipal Court of the City of Wilmington had jurisdiction of the criminal matters contained in the Non-Support Act.

[6, 7] The next question relates to the procedure on appeal and the filing of a new information in the appellate court. An appeal to the Court of General Sessions from the Municipal Court having been taken by the defendant, the Attorney General filed in the appellate court a new information differing in some respects from that in the lower court, and it is claimed that this was error, and that the case must be proceeded with upon the record of the court below. The constitutional provision above quoted respecting the jurisdiction of inferior courts simply provides that there shall be an appeal to the Court of General Sessions, and there is

not there any procedure provided as to the mode of taking or hearing the appeal, nor does any statute do so in explicit terms, but if at all only inferentially. Speaking generally an appeal effects a removal of the cause to another tribunal and involves a hearing *de novo* on both facts and law, as distinguished from a writ of error or certiorari, by the use of which questions of law only are subject to re-examination. By the constitutional provision as to inferior courts the General Assembly may by law regulate the jurisdiction to be conferred on such inferior courts, and the General Assembly gave this jurisdiction to the Court of General Sessions and Municipal Court of the City of Wilmington, "subject to the right of the accused to appeal as provided by law in other cases." (See *Section* 2 of the Non-Support Act.) The legislature having given to the Municipal Court of Wilmington, an inferior court of the state, existing in 1897, the time when the Constitution was adopted, jurisdiction of the Non-Support Act, the duly established procedure of that court was naturally and properly adopted for the trial of cases arising under that law, including an information there filed in place of an indictment. With equal appropriateness the method of taking appeals from the judgments of the Municipal Court should be adopted, as the most natural meaning of the statute giving to the defendant convicted under the Non-Support Act an appeal "as provided by law in other cases," *viz.*, in other cases which the Municipal Court had theretofore been given jurisdiction to hear and determine, and with respect to which the judge of that court was not sitting merely as a committing magistrate, but to adjudicate a cause. In the statute respecting the Municipal Court of Wilmington there are two sections to be considered, *viz.* *Section* 23 and *Section* 21 of *Volume* 17, *Laws of Delaware, c.* 207. By *Section* 23 a person against whom a judgment has been entered in that court for violation of a city ordinance, and who has been committed for failing to satisfy the judgment, may appeal to the Superior Court, and as to procedure the act provided thus:

"The filing of a transcript, modes of trial and forms of proceeding shall be as in cases of appeal from the judgments of justices of the peace."

In *Section* 21 of the same act, it is enacted that, if in a prose-

cution in the Municipal Court for a nuisance affecting the public streets the defendant by affidavit claims a right of property in the street, further proceedings are stayed in the Municipal Court and the clerk thereof is required to transmit to the Court of General Sessions a copy of the record, ''and thereupon the case shall be proceeded in at the next term of said court upon the information set forth in the copy of the said record, in like manner and with like effect as upon an indictment for the like offense.''

[8, 9]   Do either of these sections, both of which were in force when the Non-Support Act was passed, provide a procedure for hearing appeals in cases arising under the Non-Support Act? Clearly the latter does not, for it is in no sense an appeal, but is a change of venue, or transfer of the cause, in advance of a trial thereof.   It is equally clear to us that the former section (*Section* 23) does furnish a theory of procedure, though the appellate tribunal therein mentioned be a civil and not a criminal court, and though a transcript refers naturally to the record of a civil and not of a criminal suit, and though the judgment of a justice of the peace in a civil cause is not analogous to a judgment in the Municipal Court upon conviction of a violation of the Non-Support Act. On appeal from the judgment of the Municipal Court under that act the case is heard *de novo* in the Court of General Sessions as appeals to the Superior Court from a justice of the peace are heard, including a new information in the appellate tribunal corresponding to the narr. in the Superior Court.   The case of *Pratesi v. The Mayor and Counsel of Wilmington*, 4 *Pennewill*, 258, 54 *Atl.* 694, confirms this view, and is pertinent here, for the offense of which the defendant in that case was convicted below, *viz.*, maintaining a nuisance by obstructing a public street, though it was a violation of the ordinance of the City of Wilmington, was none the less criminal in its nature.   The Attorney General had a right therefore to file in the Court of General Sessions a new information against the defendant, Donaghy, and the established practice to such effect is approved.

[10]   The next question relates to the variations of the new information from that filed in the court of original jurisdiction. The information filed in the Court of General Sessions differed

from that in the Municipal Court in two respects, and they will be considered separately: (1) In the latter the defendant was charged with having committed a certain offense "without just cause," and in the former "without lawful excuse." It was urged that by the act there were two kinds of offenses, one by a husband who "without just cause" refuses to support his wife, and the other by a parent who "without lawful excuse" refuses to support his or her children. There is so little real difference of meaning between the two phrases above quoted, even in the connection in which they are used, that they must be deemed to be synonymous, and, so far as those quoted words were concerned, not only was there a statutory offense charged in the information below, but there was also no real variation therefrom in the information filed in the appellate court. (2) The other variation between the two informations consisted in the omission from that in the Municipal Court of the name of the defendant's child, with the non-support of whom the defendant was charged, while in the information filed in the Court of General Sessions the name of the child was stated to be Henry Donaghy.

By the Constitution one accused of a crime is secured in his right "to be plainly and fully informed of the nature and cause of the accusation against him." *Article* 1, § 7. Accordingly, it has been held that in an indictment for selling liquor by the small measure "to one ————," the name of the person to whom it was sold must be specified if known, in order to give the accused certain knowledge of the specific offense with which he was charged, though it would have been held differently if he had been charged with a course of conduct or habit, arising from a continuance of acts of the same nature. *State v. Walker*, 3 *Harr.* 547. Obviously a charge of an assault must contain the name of the person assaulted for the identification of the person injured, as well as being a material description of the offense. There is no doubt as to the general principle. The wise and wholesome language in *Bishop on Criminal Procedure*, §517 *et seq.*, quoted by counsel for the defendant in his brief, must ever be had in mind. Without making a full quotation, the author says:

" * * * Every fact which is an element in a *prima facie* case of guilt must be stated; otherwise there will be at least one thing which the accused person is entitled to know, whereof he is not informed. And that he may be certain what each thing is, each must be charged expressly and nothing left to intendment. All that is to be proved must be alleged."  ·

[11] But it does not follow that the information in the Municipal Court was defective in that in charging the defendant with neglect to support ''his minor child under sixteen years of age," it did not state the name of the child. Undoubtedly the information in the Municipal Court must have the same degree of particularity in alleging the offense as is required of an indictment, for which it is a substitute. One important reason for such particularity is the protection of the accused if he be convicted from a second charge for the same offense. ·

[12] We cannot agree with the decision of the Texas court in *Irving v. State*, 73 *Tex. Cr. Rep*. 615, 166 *S. W*. 1166, cited by the defendant, where an information which charged the defendant with desertion of his wife, without giving her name, was held defective on that account. Presumably a man has but one wife, and her name is known to him, and to say that he was charged with desertion of an unknown and uncertain person occupying the legal status of a wife. is unreasonably captious. But the case of *State v. Bitman*, 13 *Iowa*, 485, cited by the defendant, is more reasonable. There the defendant was charged with cruelly and inhumanely whipping and beating ''his. own child, being about three years old," without naming the child. A demurrer was filed in the lower court based on this objection and it being overruled and the defendant having been convicted, an appeal having been taken, the appellate court held the information defective by reason of the omission of the name of the child. Theoretically the court in the case cited was right, for there is no presumption that the accused has but one child about three years old, and he may have others within that description. But practically the omission is not a limitation on his right to be informed of the name of the person with respect to whom the offense was committed. · If as is the fact in this case he has but one child, he knows to whom the charge refers. This principle must not be extended beyond the relationship .of parent and child, or husband and wife, for it is based on the peculiar

features of that relationship. It follows that the new information in the appellate court was not demurrable there if the objection be based on the addition of the name of the child of the accused; and the reason of the court below is sensible and, therefore, sound. There was no error in overruling the demurrer based on this point, and the objections to the new information are not sustained. As pointed out by the brief of the Attorney General, the facts of the cases cited by the defendant on this point show that they are not helpful.

The solution of two questions which remain to be considered depends largely upon questions of fact. It was shown as a fact that the defendant did not provide for the support and maintenance of the child. It was contended, however, that it was not shown that "without lawful excuse" he deserted or failed to support the child or that the child was "in destitute and necessitous circumstances." Was there "lawful excuse" for the failure of the accused to support his child?

[13, 14]　The excuse given was that his wife would not come with the child to live with him in a place to which he invited her to come. But it sufficiently appears from the evidence, that because of physical violence shown to her by him she was afraid to do so. Under the circumstances, even if the mother did refuse to bring the child to live with his father, there was no legal excuse for the failure of the father to support his child. Undoubtedly a husband has a right to establish the family domicile and in general it is the duty of his wife to live in that domicile, and she loses some of her rights to support in case she unreasonably refuses to do her duty; but there are reasons which may justify her in living elsewhere and fear of personal violence from her husband surely is a proper one.

After a careful consideration of the facts, we believe the court below was right in finding there was no lawful excuse for the failure of the defendant to provide for his child, without more fully stating the reasons therefor.

[15]　Was the child in destitute and necessitous circumstances within the intendment, purpose and scope of the statute? A child three years old, having no property, is in "destitute or neces-

sitous circumstances'' when the father can but does not, and the mother cannot, provide for the support of the child, though both mother and child be in fact supported by the child's maternal grandfather, who was under no legal obligation to furnish such support.   This view of the statute, which has been called the humane construction thereof, is based on sound reason, as well as the great weight of authority of courts elsewhere, which have considered statutes almost precisely like that of Delaware.   *State v. Waller* 90 *Kan.* 829, 136 *Pac.* 215, 49 *L. R. A.* (*N. S.*) 588; *State v. Bess*, 44 *Utah*, 39, 137 *Pac.* 827; *Brandel v. State*, 161 *Wis.* 532, 154 *N. W.* 997.

In *Brandel v. State*, cited above, the court there announced its view, calling it the "humane" construction of a statute precisely like that in Delaware:

"A wife is in necessitous circumstances   *   *   *   when she does not have property or money available for such necessities or ordinary comforts of life as her husband can reasonably furnish, even though she has the clothing, furniture, and ornaments usually owned by a woman in her station in life or receives aid from others."

In *State v. Waller*, cited above, the court said of a similar act:

"The essence of the act is that a man shall not be allowed to shift the burden of supporting his wife and children upon others under no obligation to bear it, and possibly upon the state itself.   Therefore, whenever a husband, without just cause, neglects or refuses to provide for the support and maintenance of his wife and thereby places her in such a situation that she stands in need of the necessaries of life, it is not material that they are supplied by her own labor or by sympathizing relatives, friends, or strangers, so that she does not in fact suffer from privation.   He is guilty if he leaves her in such circumstances that, without her own efforts or outside help, she would lack the necessaries of life."

In *State v. Bess*, cited above, the court said:

"The fact that the destitution and suffering of the children were relieved by the acts of kind and charitable friends does not, as counsel seem to contend, exculpate the defendant for his dereliction, if he were wilfully derelict in failing to relieve the wants and suffering of the children by providing them with the common necessaries of life."

In this case the court viewed the statute as not only providing a punishment for dereliction of duty of a parent, but also a means of enforcing the continuing liability to provide support.   Its

object is not only to protect the state against the effects of pauperism, but also to actually secure to the wife or child money for food, raiment and shelter.    This double purpose is evident in the Delaware act, for it provides not only punishment, but also enforces payment of money for wife or child by requiring the parent to give a bond or recognizance for the purpose with surety.    Such an act is not made ineffective in cases where other persons provide the support for a wife or child who would be hungry, or naked or unsheltered, unless provided for by the state or by friends, relatives or charitable persons, for the person who ought to pay therefor has not been made to do so. We cannot consent to an interpretation of the act which would relieve a parent from all liability under the act to support his infant child until it was actually starving, naked or homeless.    The parent's liability exists under it when, so far as anything he has done, the child would have starved, become naked or homeless, for in such case the child is in destitute and necessitous circumstances.

The conclusion is, that there is no error in the record and none of the assignments of error are sustained.

The judgment of the court below will be affirmed.

PENNEWILL, C. J., concurred.

BOYCE, J., dissenting:—'"The Municipal Court for the City of Wilmington'' was created and its jurisdiction limited and defined by an act of the General Assembly, passed April 13, A. D. 1883, being *Chapter* 207, *Vol.* 17, *Laws of Delaware,* under authority of *Section* 15, *Article* 6, *of the Constitution of* 1831, providing for the establishment of "inferior courts."    *Wilmington v. Vandegrift,* 1 *Marvel,* 13, 29 *Atl.* 1047, 25 *L. R. A.* 538, 65 *Am. St. Rep.* 256.

The said Municipal Court exists under said act, affected only in matters of jurisdiction by *Section* 30, *Article* 4, *of the Constitution of* 1897, and by subsequent acts of the General Assembly authorized thereby.    *Forbes v. State,* 2 *Penn.* 197, 43 *Atl.* 626; *State v. Churchman,* 3 *Penn.* 361, 51 *Atl.* 49.

The first question to be determined in this case is whether the act of assembly, entitled ''An act relating to desertion and non-

support of wife by husband, or of children by either father or mother, and providing punishment therefor," approved February 24, A. D. 1913, being *Chapter 262, Vol. 27, Laws of Delaware*, conferring upon the Court of General Sessions and the said Municipal Court original and concurrent jurisdiction in all cases arising under the act, is authorized by the present Constitution, in so far as it attempts to confer jurisdiction of the offenses created by the act upon the latter court.

A Constitution is the fundamental law of the state. As between a statute which is inconsistent with the Constitution, the latter is of paramount authority, and the former must yield thereto. It is generally recognized that a Constitution should be construed liberally, so as to give effect to the intention of its framers, and carry out the principles of government. The whole Constitution, however, is to be examined with a view to arriving at the true intention of each part. *Cooley's Const. Lim.* 72 (6th Ed.) and *Black's Const. Law*, 67 (2d Ed.).

Section 30, Article 4, of the present Constitution, set forth at length in the majority opinion, clearly and unmistakably provides for the establishment of "inferior courts" of limited, special *criminal* jurisdiction.

The clause in this provision, *viz.*, "And such other misdemeanors as the General Assembly may," etc., is relied on for legislative power for the investment of the Municipal Court with jurisdiction of the offenses created by the statute in question.

By *Section 1, Article 4*, it is provided that:

"The judicial power of this state shall be vested in a Supreme Court, a Superior Court, a Court of Chancery, an Orphans' Court, a Court of Oyer and Terminer, a Court of General Sessions, a Register's Court, justices of the peace and such other courts as the General Assembly * * * shall from time to time by law establish."

Statutory courts authorized by this section may be given jurisdiction of civil or criminal matters, or both; and jurisdiction of criminal matters conferred upon any such court, may not necessarily be limited and confined like that of inferior courts authorized by *section 30*.

By *Section* 8, *Article* 4, it is provided that:

"The Court of General Sessions shall have all the jurisdiction and powers vested by the laws of this state in the Court of General Sessions of the peace and jail delivery."

The latter court is a constitutional court and had vested in it by the laws of this state, at the time of the adoption of the Constitution, within the several counties, general "jurisdiction of all crimes and offenses not within the jurisdiction of the Court of Oyer and Terminer. * * * *"

By *Section* 20, *Article* 4, it is provided that:

"The General Assembly * * * shall have power to repeal or alter any act, * * * giving jurisdiction to the Court of Oyer and Terminer, the Superior Court, the Court of General Sessions of the peace and jail delivery, the Orphans' Court or the Court of Chancery, in any matter, or giving any power to either of the said courts. The General Assembly shall also have power to confer upon * * * the said several courts jurisdiction and powers in addition to those hereinbefore mentioned."

This section makes provision for changes in the jurisdiction of the several courts named, but it clearly does not bestow upon the General Assembly power to transfer jurisdiction conferred upon the Court of General Sessions to any inferior court established under *Section* 30, the jurisdiction of which is derived from, limited and defined by the last mentioned section. It is to this latter section one must look for the origin and jurisdiction of any inferior court established or to be established thereunder.

In this state all criminal offenses are divided into two general classes,—felonies and misdemeanors. All felonies here were expressly and specifically made so by statute in each case. *State v. Darrah*, 1 *Houst. Cr. Cas.* 112. It now very rarely happens that new offenses are made felonies. By far the greater number of offenses were and are made misdemeanors, and many of them involve more turpitude than some felonies.

If the framers of the present Constitution had it in mind to clothe the General Assembly with power to invest any inferior court, authorized by said *Section* 30, with criminal jurisdiction of every offense denominated a misdemeanor, then, if the Legislature should see fit to change offenses now deemed by law felonies into

misdemeanors, the entire jurisdiction of offenses now conferred upon the Court of General Sessions could be transferred to such inferior courts, to the exclusion of the Court of General Sessions, and without trial by jury except on appeals.

The grant of such power is plainly inconsistent with the idea of such inferior courts, and is not embraced within the letter, spirit or intent of the Constitution.

The General Assembly is not clothed with any such power as suggested. Indeed it is inconceivable that the framers of the Constitution contemplated such a thing. Statutory courts, created under *Section* 1, *Article* 4, if they should be established, would not be "inferior courts," within the meaning and purview of said *Section* 30. Herein lies the distinction between the statutory courts provided for by the Constitution. Those provided for under *Section* 1, *Article* 4, may be courts of very general jurisdiction of civil or criminal matters, or both; those provided for under *Section* 30 are *eo nomine* "inferior courts" of limited, special criminal jurisdiction.

The true intention and meaning of the phrase, "and such other misdemeanors" must be gathered not only from its position and relation to the qualifying words in the provision of the Constitution in which it is contained, but from the other provisions of the Constitution as well, vesting the judicial power of the state. Does the phrase limit the power of the General Assembly in the general kind and character of offenses, of which, if made misdemeanors, any inferior court established under said *Section* 30, may be given jurisdiction? Considerations of convenience, economy and the like, however desirable, should have little weight, if any, in determining the proper interpretation of said phrase. There are graver and more serious considerations involved,—the intention of the framers of the Constitution, which must be ascertained from the Constitution itself; the public welfare; and the interests and welfare of persons accused. It must be determined whether the specific offenses enumerated in the provision of the Constitution providing for inferior courts, within the intention of the latter provision and other provisions of the Constitution respecting the judicial power of the state, limit and confine the scope and meaning

of said phrase as misdemeanors of the same general kind and character to those specifically mentioned, though the latter are not of a class, but different in nature and characteristics.

The offenses enumerated in said *Section* 30, are not necessarily of a serious character. Assaults and batteries, may, at times, be aggravated, but ordinarily they are not. Carrying concealed a deadly weapon was, at the time of the adoption of the Constitution, a minor offense like the other offenses enumerated in said section. It is true that the legislature has enlarged the penalty for carrying concealed a deadly weapon, not, however, because the act itself is serious, but because of the consequences which often follow, or are likely to follow the act of so carrying. So that it may be said that the offenses enumerated in said *Section* 30 are in criminal classification and in fact minor offenses.

Apart from these considerations, it may be asked why the Constitution specifies certain offenses if it meant that such inferior courts might be given jurisdiction of any and all misdemeanors?

The act in question creates new offenses,— new misdemeanors, unknown as such to the criminal laws of this state before its enactment. By said act, desertion or neglect to provide for a wife by husband, or desertion, wilful neglect, or refusal of any parent to support his or her legitimate or illigitimate child or children, under the age of sixteen years, in destitute or necessitous circumstances, is made a misdemeanor, punishable by a fine not exceeding five hundred dollars, or by imprisonment with hard labor, not exceeding one year, or both. Upon conviction the court may, in its discretion, instead of imposing the penalty prescribed, or in addition thereto, make an order directing the accused to pay a certain sum periodically to the wife, or to the guardian, or custodian of such child or children, or to an organization, or individual approved by the court as trustee, and to release the accused from custody on probation, upon entering into a recognizance, etc.

It may fairly be said that this act is in purpose both criminal and civil,—criminal, in that it punishes for the offenses defined therein, when committed, by fine or imprisonment, or both; and civil in effect, in that it provides a remedy for the enforcement of civil liabilities.

The penalty for the several offenses enumerated in said Section 30 is a fine, or imprisonment, or both; and clearly nothing more is contemplated.

There is nothing in the provision evincing any intention to invest any inferior court, established or to be established thereunder, with jurisdiction and power such as is vested by the statute in question.

It was urged for the accused that an order made under the act for the payment of a certain sum periodically for support and maintenance, instead of a fine, exceeding one hundred dollars, or imprisonment exceeding one month, had the effect to defeat the right of appeal, though the aggregate amount to be paid under the order would exceed one hundred dollars. This may be so, but it should not be, in view of the proviso in said Section 30, expressly providing for appeals, if it should appear that the aggregate amount likely to be paid under an order for support, will exceed one hundred dollars.

In the argument for the state the jurisdiction conferred by the statute in question was likened to that given to justices of the peace by statute in relation to bastard children. The analogy, if there be any, is not manifest. Courts of justices of the peace are constitutional courts of ancient minor powers and jurisdiction, left, however, largely to legislative discretion as to such matters, including those criminal matters which may be conferred upon them under Section 30. Jurisdiction of bastardy cases may not be conferred under authority of said section and it bears no relation to the question here.

It was also urged that the offenses enumerated in said Section 30 have no common analogy to each other, in that the only relation which they bear to each other, is that they are within a class of offenses known as misdemeanors; and that they cannot be classified as "petty misdemeanors," because there is no such classification. It was further urged that the said phrase is broad and unlimited except in three particulars: (1) That jurisdiction can never be conferred on inferior courts except by a two-thirds vote of the members of the General Assembly; (2) Jurisdiction can never be conferred upon an inferior court of a crime deemed a felony; and

Dissenting Opinion.

(3) . The General Assembly cannot prohibit or prevent an appeal in any case where the punishment exceeds one month's imprisonment or one hundred dollars fine. ...

It is not necessary that the enumerated offenses in the provision in which the phrase is contained should have a common analogy to each other, or that they should be classed as "petty misdemeanors," in order to have a qualifying effect upon the phrase, if such effect is in fact manifest. Neither can it be assumed that the phrase is broad and unlimited, except in the three particulars mentioned, if the true intention of the several provisions of the Constitution vesting the judicial power of this state, considered together, shows the contrary. The examination made of the several provisions does not disclose an intention, on the part of the framers of the Constitution, to invest the General Assembly with power, subject to the exceptions mentioned, to give jurisdiction of any and all misdemeanors to any inferior court which may be established under said Section 30. If such a thing had been contemplated by the framers of the Constitution, they doubtless would have employed the word "any;" or some equivalent fully expressing such intention, or rather, indeed, there would have been no enumeration of offenses in said section.

I am unable to reach the conclusion that the framers of the Constitution meant to include in the phrase relied on any or all misdemeanors, not being satisfied, after painstaking consideration, that the power to give jurisdiction of the many varied and important misdemeanors to the Municipal Court is plainly and fully conferred. I am therefore of the opinion, for the reasons assigned, that the misdemeanors defined in said Chapter 262, Vol. 27, Laws of Delaware, cannot be conferred upon said Municipal Court, within the intention of the enumeration of the particular misdemeanors in said Section 30, and in contemplation of the general investment of judicial power by the Constitution of this state.

In view of my position on the first question and the length of its discussion, I am constrained to consider briefly parts only of the two remaining questions.

First, assuming that on appeal from the judgment of the Municipal Court, the prosecution is heard de novo in the Court of

General Sessions as are appeals to the Superior Court from justices of the peace in civil actions, the prosecution is, nevertheless, the same as the one upon which the judgment was entered below.   On appeals in civil cases the practice is well settled that the pro-narr. must conform to the transcript.   And if it should appear that the pro-narr. fails to correspond with the record of the case below in the cause of action, the court will, on motion, set it aside for irregularity.   *McDowell v. Simpson*, 1 *Houst*, 467; *Lord v. Townsend*, 5 *Harr.* 457; *Townsend v. Steward*, 4 *Harr.* 94; *Norton v. Janvier* 5 *Harr.* 346.

By analogy, if a new information may be filed in criminal appeals, this settled practice must be applied for the reason that the appeal must be a trial of the same cause as was tried below. 12 *Cyc.* 342; 1 *A. & E. Ency. of Law*, 627; *Com. v. Blood*, 4 *Gray* (*Mass.*) 31; and *Com. v. Phelps*, 11 *Gray* (*Mass.*) 72.

If the original offense, as shown by the record below, and on which the accused was tried, can on appeal be abandoned, and another and distinct offense substituted in its place, and support it by proof, then, as was said in *Com. v. Blood*, supra, "it is obvious that the right of appeal, which was intended solely as a benefit and privilege to the party charged, might often be converted into a burden, and a snare."   On the same principle if the information filed below is fatally defective in the description and identification of the offense intended to be charged, the information filed in the Court of General Sessions may not include other and distinct allegations necessary to meet the requirements of law.   Every element necessary to show a *prima facia* case of guilt must be alleged in the information in the first instance before there can be a valid conviction.   1 *Bishop, Crim. Pro.* § 517.

If the conviction below was invalid because of a fatally defective information there can be no trial in the Court of General Sessions, on appeal, either with or without a new, sufficient information, for want of jurisdiction, though the latter court might have had original jurisdiction of the offense.

Again, it is a well recognized rule of criminal pleading that not only the name of the accused when known but that of the injured third person must be alleged in the indictment or information with

certainty; for it is necessary to clearly specify the particular offense so that the accused may be informed of the exact charge which he has to meet, and that the offense may be identified. On appeal, as already shown, the pleading in the lower court must be adhered to, and the new information may not describe a different offense as by the insertion of the name of the injured, or third person, or other essential allegation.

This general principle is recognized as wise and wholesome by the majority opinion; but it is said that "it does not follow that the information in the Municipal Court was defective in that in charging the defendant with neglect to support 'his minor child under sixteen years of age,' it did not state the name of the child," and the reason assigned is "if as a fact he (the defendant) has but one child he knows to whom the charge refers."

I know of no rule of criminal pleading requiring the accused to make such inference. He is entitled to know upon what individual he is supposed to have committed the alleged offense and if this does not clearly appear it is his right to move to quash the information for insufficiency as was done in this case. If his motion be denied and he is put on trial, and is convicted, he has the right by certiorari, which is addressed to errors of law, and not to the evidence adduced at the trial, to test the validity of the conviction. I do not deem it wise to depart from a principle of criminal pleading so generally recognized even in favor of "the relationship of parent and child, or husband and wife" though "based on the peculiar features of that relationship."

*Second*, I cannot agree with the majority of the court in the disposition made of the phrase "in destitute or necessitous circumstances," contained in the statute. I think the conclusion reached has the effect to eliminate the words of the phrase from the statute,—words, in legislative contemplation and purpose, intended to have the force and effect naturally to be gathered from the language employed. If they were intended to mean nothing, it is fair to assume that they would not have been incorporated in the act. The fact that a child is "in destitute or necessitous circumstances" is a matter which must not only be averred in the indict-

ment or information, but must be proved; and the fact may be disproved by any competent testimony.

Again, the husband had the right reasonably to establish the domicile of his family. If the wife and her child lived with her parents separate and apart from her husband, it was competent to inquire of her on cross examination, "Are you willing to take your child to your husband and live with him in a home provided for by him?" This and other questions asked the wife, affecting the marital relations, and their bearing upon the question of whether the husband was or was not "without lawful excuse" for not supporting the child, as well as the question of the necessities of the child, were of matters gone into on the examination in chief, and were either pertinent and relevant, and should have been allowed, in view of the testimony of the wife in her direct examination, or the latter testimony should have been stricken out, on the motion made therefor.

It is incumbent upon the state in a prosecution to prove every essential element of the crime charged beyond a reasonable doubt. The record does not disclose that the husband was not without lawful excuse for not supporting the child, or that it was in destitute or necessitous circumstances within the intent and meaning of the act.

I am of the opinion that the judgment below should be reversed for want of jurisdiction, as well as for the other reasons assigned.

The foregoing opinions having been filed for inspection, the attorney for the plaintiff in error, before the signing of the decree, presented his petition to the court, praying for a re-argument and reconsideration of the decision of the court as contained in its opinion, and as grounds therefor represented as follows:

That the decision in this cause is a decision by a divided court.

That the decision of the majority of the court raises at least one question which was not argued.

That the time allowed for argument in the Supreme Court was considerably less than that provided in the rules and was insufficient for a thorough presentation of the many important questions involved in the cause.

That the general phrase construed in the case of *Hull*, 18 *Idaho*, 475, 110 Pac. 256, 30 *L. R. A.* (N. S.) 465, was not "or other such" as it might seem from the brief of your petitioner and as is stated in the opinion of the majority

Petition for Re-argument.

of the court. This case was cited because of its clear statement of the doctrine of *ejusdem generis.* The statute there construed was:

"It shall be unlawful for any person or persons in this state to keep open on Sunday any  *   *   * theatre, play house, dance house, race track, merry-go-round, circus or show, concert saloon, billiard or pool room, bowling alley, variety hall, or any such place of public amusement.   *   *   * "

That the decision of the majority of the court with regard to the constitutional question as to the jurisdiction of the Municipal Court is inconsistent, because the decision first holds that the misdemeanors specified in the Constitution are not *ejusdem generis* and then recognizes a test which serves completely to differentiate the misdemeanors of the Constitution from that in the statute. In other words, the decision fails to consider the punishments affixed by the General Assembly yet states that a "double purpose is evident in the Delaware act, for it provides not only punishment, but also enforces payment of money for wife or child by requiring the parent to give a bond or recognizance for the purpose with surety." It is respectfully submitted that this double purpose—this commingling of punishment with the enforcement, by criminal procedure, of a civil liability over which the Municipal Court can have no jurisdiction—takes the misdemeanor of the statute out of the genus of the Constitution. The misdemeanors specified in the Constitution are all punishable only by fine, or imprisonment, or both, whereas the misdemeanors of the statute are punishable by fine or imprisonment, or both and the enforcement of a civil liability; and if the punishment fixed by the General Assembly may not be a means of determining the genus, then it will be quite possible for the General Assembly to give to the Municipal Court jurisdiction of newly created misdemeanors for which the whipping post or the specific performance of contracts are the only punishments. Hence it is respectfully submitted that the decision of the majority of the court leaves the jurisdiction of the Municipal Court limited only by the discretion of the General Assembly and not by the Constitution of the State of Delaware.

That if appeals to the Court of General Sessions are to be founded upon the law and practice of appeals to the Superior Court from justices of the peace, the judgment of the Court of General Sessions, in this cause must be either reversed or corrected because it dates back to the date of conviction in the Municipal Court. If the trial is *de novo,* the judgment is *de novo.* This error of the Court of General Sessions was assigned   *   *   * and attention was called to it in the brief of your petitioner.   *   *   * It was not argued because of the limited time and it is not considered in the decision of this honorable court. It is respectfully submitted, however, that the affirmation of the judgment would amount to holding that a judgment of the Superior Court may be dated back to the date of the justice's judgment so as to bind the lands and tenements of the defendant from that date.

That the decision of the majority of the court in holding that the information in the Municipal Court was not fatally defective for want of the name of the injured party has failed to follow the established rule of law. The learned Attorney General could not cite a single case in which such an information had been held to give jurisdiction. Your petitioner can find no authority for an exception to the uniformly settled rule that the name of the injured party is necessary to the identification of the offense. Your petitioner can find no authority for an exception founded on the relation of parent and child or husband and wife. Your petitioner can find no authority for an exception founded on the fact that the accused must have known who was meant. The mass of authorities on this subject involving any and every relationship were not presented to this honorable court: First, because the rule of law seemed unquestionably settled; and second, because your petitioner was not anxious

to win this case on one point only which might merely postpone the litigation. Now, however, when there is a likelihood of the creation of an exception to the rule under consideration, your petitioner desires respectfully to call attention of this honorable court to the reason that there can be no exception to the rule.

A man is accused of deserting "his wife" as in the case of *Irving v. State*, 73 *Tex. Cr. Rep.* 615, 166 *S. W.* 1166, with which the majority of the court disagrees. Presumably a man has only one wife and her name is known to him, hence at first sight it might be said that he is "plainly and fully informed of the nature and cause of the accusation against him." But he is not, for the mere fact that he is charged with deserting "his wife" does not inform him that the prosecutrix is the person whom he knows to be his wife. He prepares, for instance, his defense as against Mary Doe, his lawful wife, and at the time of trial he is prepared to meet any charges which she may make, but the person who appears in court as the prosecutrix is not Mary Doe but Jane Roe who claims to be the wife of the accused. It is then apparent that the defenses which have been prepared are unavailing, that the issues have been entirely changed, that the real question is then whether Jane Roe is the wife of the accused, and that the accused was not "plainly and fully informed." Under such circumstances it is respectfully submitted that this honorable court would have made no exception founded on the relationship of husband to wife. The reason for the rule and the necessity for its universal application would have been most obvious and the court would have followed the Texas case.

Whether your petitioner was injured in this case by the omission in the information is not the test. One accused of an assault or any other offense may not be injured by a similar omission for he may know who is meant and he may be convicted with due regard to the merits of the case and the welfare of the community. Nevertheless it would not be held by this honorable court that the trial court had jurisdiction or that the conviction was lawful. In other words, the test cannot be whether the accused ought to be presumed to have known whom he has injured, but it must be whether the accused was plainly and fully informed. The test cannot be theoretically correct in · *State v. Bitman*, 13 *Iowa*, 485, and practically wrong in the case of *Donaghy v. State*. It is respectfully submitted that the decision of the majority of the court breaks open a most dangerous gap in the ancient wall of protection built around an accused both by the authorities and the Constitution; and it is further respectfully submitted that not only the weight of authority but all authority supports the contention of your petitioner that the Municipal Court was without jurisdiction of this cause.

That the majority of the court has misconceived the question pertaining to the phrase "without lawful excuse." Although it is true that the want of lawful excuse depends upon a state of facts, the question is not whether such a state of facts *does* sufficiently appear from the evidence, but whether such a state of facts *can* lawfully and sufficiently appear from the evidence when the · Court of General Sessions held that evidence of physical violence was proper only "to show a leaving in the first place" and then sustained objections to questions which might have proved the evidence untrue. If fear of personal violence constitutes "lawful excuse," it is respectfully submitted that this honorable court must decide that the Court of General Sessions erred in not admitting testimony which bore upon the fear of personal violence. If, on · the other hand, the marital relations are immaterial where the child is concerned, it is respectfully submitted that this honorable court must decide that the Court of General Sessions erred in considering the testimony with regard to personal violence and this honorable court must hold that the state showed ₀ no want of lawful excuse. The dilemma is clear; it is not sophistical; it is

not captious. The evidence concerning personal violence was either material or immaterial. If material, the Court of General Sessions should have given the accused every opportunity to show that there was no personal violence. If immaterial, the Court of General Sessions should have stricken from the record all testimony concerning it and should have held that the state had failed to prove its case. In other words, the fact that this honorable court has deemed the alleged "physical violence" of importance makes it clear that the Court of General Sessions erred.

That the majority of the court has been misled by the authorities supposed to support the so-called "humane" construction of the phrase "in destitute or necessitous circumstances." An examination of the authorities cited shows that the case of *Brandel v. State*, 161 *Wis.* 532, 154 *N. W.* 997, relies upon the case of *State v. Waller*, 90 *Kans.* 829, 136 *Pac.* 215, 49 *L. R. A.* (*N. S.*) 588, which overrules the established rule of law that a penal statute is to be construed strictly. These two cases may be regarded as authority for the "humane" construction; but it is respectfully submitted that they are counterbalanced both in logic and in weight by the case of *State v. Thornton*, 232 *Mo.* 298, 134 *S. W.* 519, 32 *L. R. A.* (*N. S.*) 841, and the Georgia cases, and it is further submitted that the reasoning in the Brandel and the Waller cases was drawn from cases where the statute contained no qualifying phrase whatsoever.

In the case of *Poole v. People*, 24 *Colo.* 510, 52 *Pac.* 1025, the statute was as follows: "It shall be unlawful for any man, residing in this state, to wilfully neglect, fail or refuse to provide reasonable support and maintenance for his wife."

Indeed, the court in that case commented upon the fact that under such a statute the accused was not relieved from furnishing support no matter what were the financial means of the wife.

In *People v. Malsch*, 119 *Mich.* 112, 77 *N. W.* 638, 75 *Am. St. Rep.* 381, the statute read: "All persons who, being of sufficient ability, refuse or neglect to support their families.  *  * "

In *State v. Witham*, 70 *Wis.* 473, 35 *N. W.* 934, the statute construed was similar to that in *People v. Malsch.*

In *Burton v. Commonwealth*, 109 *Va.* 800, 63 *S. E.* 464, the evidence was held insufficient to show that the wife was in destitute or necessitous circumstances and the questions of support by others and of the construction of the statute were not even touched upon.

Nevertheless these cases are now in the opinion of the majority of the court and were cited in the case of *State v. Bess*, 44 *Utah*, 39, 137 *Pac.* 829, to sustain the "humane" construction. An examination shows that the suggestions of the court in *State v. Bess* amount to unsupported obiter; for in that case the judgment of conviction was reversed and in addition the court found, as a matter of fact, that under the strict construction of the statute as contended for by the defendant, the children were nevertheless actually in destitute circumstances. Owing to the lack of time allowed for argument there was no opportunity to call the attention of this honorable court to these cases in detail; but it is respectfully submitted that the so-called "humane" construction is not compatible with the established rule of law applicable to the construction of penal statutes, that this construction is not supported by the weight of authority of courts elsewhere, and that this construction can have no other effect than to strike the phrase from the statute.  .

Wherefore, to the end that these errors may be corrected, your petitioner again respectfully prays that this honorable court shall grant a re-argument both on brief and orally and that the said decision may be reconsidered and amended accordingly.

By his Attorney.  *  *  *

33

To which was added a certificate:

"That in my judgment, the foregoing petition is well founded, and that the same is not interposed for delay." * * * *

The prayer of the petitioner was granted, and the cause was set down for rehearing and re-argument at Dover, on the twenty-second day of December, A. D. 1916.

RE-ARGUMENT OF COUNSEL FOR PLAINTIFF IN ERROR.

The contention of the plaintiff in error is that the doctrine of *ejusdem generis* is applicable to the construction of the general words in *Article* 4, § 30, of the Constitution.

That the misdemeanor defined in *Chapter* 262, *Vol.* 27, *Laws of Delaware*, is not within the genus of the misdemeanors specified in the article of the Constitution heretofore mentioned. It is readily admitted that there are many differences between assaults and batteries and an offense against the revenue laws, such as keeping without license a tavern, but it is insisted that there are characteristics common to all of the misdemeanors specified in the Constitution and that the misdemeanor under consideration lacks those common characteristics. These characteristics are: (1) The misdemeanors specified in the Constitution are all punishable by summary convictions at common law. (2) The misdemeanors specified in the Constitution are all "petty" misdemeanors. (3) The misdemeanors specified in the Constitution are all punishable by fine or imprisonment, or both. (4) The misdemeanors specified in the Constitution are all common law offenses.

The misdemeanors specified in the Constitution are all punishable by summary convictions at common law. 4 *Black. Con.* 280.

The misdemeanors specified in the Constitution are all "petty" misdemeanors. Such a classification has been recognized since the very early days of the common law and that the phrase "petty misdemeanors" is used whenever summary convictions are referred to. 12 *Cyc.* 321; *Bishop's Crim. Pro.* §§ 152 and 153; *Low v. U. S.*, 169 *Fed.* 86, 89, 90, 94 *C. C. A.* 1; *Pearson v. Wimbish*, 124 *Ga.* 701, 52 *S. E.* 751, 756, 4 *Ann. Cas.* 501; *Schick v. U. S.*, 195 *U. S.* 65, 24 *Supt. Ct.* 826, 49 *L. Ed.* 99, 1 *Ann. Cas.* 585.

The framers of the Constitution intended to confine the jurisdiction of inferior courts to such petty misdemeanors as have always been punishable by summary convictions.

The misdemeanors specified in the Constitution are all punishable by fine or imprisonment, or both.

The nature of the punishment determines the genus of the crime. The misdemeanors specified in the Constitution are *ejusdem generis* in punishment. Whereas the misdemeanor of the statute is punishable not only by fine or imprisonment or both, but also by the enforcement of a civil liability.

This double purpose—this commingling of punishment with the enforcement by criminal procedure of a civil liability, over which the municipal court can have no jurisdiction—takes the misdemeanor of the statute out of the genus of the Constitution and serves completely to differentiate them.

The framers of the Constitution did not intend to leave the jurisdiction of inferior courts limited only by the discretion of the General Assembly and not by the Constitution of the State of Delaware, for if the framers had intended the general words of *Article* 4, § 30, to be used in their unrestricted sense, they would have made no mention of the particular classes which they had in mind. 36 *Cyc.* 1119, 1120.

Granting that the words, "such—as," amount to the relative pronoun "which," nevertheless the word "misdemeanors" is modified by "other," and even if the framers had gone still further and said "any other" or "all other," the doctrine of *ejusdem generis* would be applicable, provided the misdemeanors mentioned were species of some well recognized genus.

The case of *Hull*, 18 *Idaho*, 475, 110 *Pac.* 256, 30 *L. R. A.* (*N. S.*) 465, has been cited to the court not only because of the broad language used in the statute there construed, but also because of the clear reasoning of the court. See, also, *U. S. v. Garretson* (*C. C.*) 42 *Fed.* 22; *State v. Goodrich*, 84 *Wis.* 359, 54 *N. W.* 577; *Ex parte Williams*, 87 *Pac.* 565.

The misdemeanors specified in the Constitution are all common law offenses.

It has been held that where the actions mentioned in a statute

were all known to the common law, the phrase, "other actions", would be limited by the genus. *Valentine v. Boston*, 20 *Pick.* (*Mass.*) 201.

All the misdemeanors in *Article* 4, § 30, of the Constitution are ancient offenses which have commonly been punishable by summary convictions. At the time of the adoption of the Constitution there were other ancient offenses belonging to the same genus which were not specified in *Article* 4, § 30. For example, the punishment of those found drunk or excited by liquor and noisy in a public place, or of profane swearers or of those who shall use abusive, railing or threatening subjects against a magistrate, or of those who perform worldly employment, labor or business on the Sabbath Day, was not included by the framers of the Constitution.

Such offenses as these and only such offenses as these are *ejusdem generis* with the misdeanors specified in the Constitution. and that the phrase, "other misdemeanors," must be construed by this court to include only such misdemeanors.

Granting that the doctrine of *ejusdem generis* does not apply where the specific words signify subjects greatly different from one another, nevertheless, where a genus is obvious, it is respectfully submitted that the court cannot avoid the rule by pointing out the dissimilarities which exist between the species constituting the genus. *Reg. v. Cleworth*, 4 *B. & S.* 927; *Sandiman v. Breach.* 7 *B. & C.* 96; *Peate v. Dicken*, 1 *C. M. & R.* 422; *St. Louis v. Laughlin*, 49 *Mo.* 559.

The well-known case of *Casher v. Holmes*, 2 *B. & Ad.* 592, held that where an act imposed certain duties on "copper, brass, pewter, and tin, and on all other metals not enumerated," the latter words did not include gold and silver. Here the language was broad enough to have included any metal, and there are many characteristics of each of the metals enumerated which are not common to the others, but the court held that there was a genus intended which did not include the so-called precious metals.

It is respectfully submitted that the cases previously cited by the state are not applicable in a determination of this case, because the misdemeanors specified in the Constitution do belong to the genera above pointed out.

In the case of *Jones v. State*, 104 *Ark.* 261, 149 *S. W.* 56, *Ann. Cas.* 1914C, 302, there was no genus.    In the case of *Brown v. Cor. Corbin*, 40 *Minn.* 508, 42 *N. W.* 481, there may have been a genus, but the court held that the phrase, "other lawful business," was intended as a catch-all, by reason of the fact that several amendments had previously been made in order to make the statute as exhaustive as it was intended to be.

The case of *McReynolds v. People*, 230 *Ill.* 623, 82 *N. W.* 945, is contrary to *Bucher v. Commonwealth*, 103 *Pa.* 528, and the case of *State v. Eckhardt*, 232 *Mo.* 49, 133 *S. W.* 321, was decided as it was largely because the statute in question practically followed the New York statute, although the latter statute named many more places where the crime of abandonment could take place. The case of *U. S. v. Bevans*, 16 *U. S.* 336, 390, 4. *L. Ed.* 404, the case of *In re Kelly* (*C. C.*) 71 *Fed.* 545, 550, and the case of *Jones v. Gibson*, 1 *N. H.* 266, 272, are contrary to the case of *State v. Eckhardt, cited supra.*

If appeals to the Court of General Sessions are to be founded upon the law and practice of appeals to the Superior Court from justices of the peace, the judgment of the Court of General Sessions must be either reversed or corrected.

The Court of General Sessions on January thirty-first, 1916, adjudged the plaintiff in error guilty, and nevertheless ordered him to make payments for the support of his minor child, beginning on the third day of March, A. D. 1915.    The Court of General Sessions should have either reversed or affirmed the judgment of the Municipal Court, or the Court of General Sessions should have entered a proper judgment *de novo.*

The information in the Municipal Court was fatally defective for want of the name of the injured party.

The court has followed the Court of General Sessions by holding that the new information in the appellate court was not demurrable because of the addition of the name of the child of the accused. The important question is not whether the new information was demurrable, but whether the information in the Municipal Court was not so fatally defective as to fail to give jurisdiction.

Persons other than the defendant and particularly the persons

injured are universally required to be alleged in criminal proceedings for the identification, as well as the material description of the offense. *State v. Walker*, 3 *Harr*. 547; *State v. Pollock*, 105 *Mo. App*. 273, 79 *S. W*. 980; *Morningstar v. State*, 52 *Ala*. 405; *State v. Irvin*, 5 *Blackf*. (*Ind*.) 343; *Butler v. State*, 5 *Blackf*. (*Ind*) 280; 1 *Chitty Cr. Law*, *213; *Bac. Abr. Indict. G*. 2; 2 *Hawk. P. C. c*. 25, § 71; 10 *Enc. Pl. & Pr*. 505, 506; *Joyce on Indictments*, §354.

The court has recognized the general principle, but has made an exception in the case of parent and child and the husband and wife, based on the peculiar features of that relationship. The cases of *State v. Bitman*, 13 *Iowa*, 485, and *Irving v. State*, 73 *Tex. Cr. R*. 615, 166 *S. W*. 1166, are directly opposite to such an exception, and it is respectfully submitted that these cases are not only theoretically but practically correct. The case of *Irving v. State* involved unnamed minor children as well as an unnamed wife.

The rules of criminal pleading demand exact certainty and not certainty to a common intent.

The Court of General Sessions erred in its rulings on the testimony pertaining to physical violence.

The evidence concerning personal violence was either material or immaterial. If material, the learned Court of General Sessions should have given the accused every opportunity to show that there was no personal violence. If immaterial, the learned Court of General Sessions should have stricken from the record all testimony concerning it and should have held that the state had failed to prove its case. The fact that this honorable court has deemed the alleged physical violence of any importance whatsoever makes it clear that the learned Court of General Sessions erred.

What constitutes "in destitute or necessitous circumstances," under *Section* 1, *Chapter* 262. *Vol*. 27, *Laws of Delaware?*

There are two authorities which strike the words "in destitute or necessitous circumstances" out of the statute by judicial construction. *State v. Waller*, 90 *Kan*. 829, 136 *Pac*. 215, and *Brandel v. State*, 161 *Wis*. 532, 154 *N. W*. 997.

The former case expressly overrules the established principle of the law that a penal statute is to be construed strictly, and the latter case relies upon the former. These two cases may be regarded as authority for the so-called "humane" construction, but it is respectfully submitted that they are counterbalanced both in logic and in weight by the case of *State v. Thornton*, 230 *Mo.* 298, 134 *S. W.* 519, the Georgia cases, and other cases hereafter cited. It is further submitted that the reasoning in the Brandel and the Waller Cases was drawn from cases where the statute contained no qualifying phrase whatsoever.

Thus, in the case of *Poole v. People*, 24 *Colo.* 510, 52 *Pac.* 1025, the statute was as follows:

"It shall be unlawful for any man, residing in this state, to willfully neglect, fail or refuse to provide reasonable support and maintenance for his wife.".

Indeed, the court in that case commented upon the fact that under such a statute the accused was not relieved from furnishing support no matter what were the financial means of the wife.

In the case of *People v. Malsch*, 119 *Mich.* 112, 77 *N. W.* 638, 75 *Am. St. Rep.* 381, the statute read:

"All persons who, being of sufficient ability, refuse or neglect to support their families. * * * "

It is obvious that under such a statute there can be no question of whether the neglected family is in destitute or necessitous circumstances.

In *State v. Witham*, 70 *Wis.* 473, 35 *N. W.* 934, the statute construed was similar to that in *People v. Malsch*.

In *Burton v. Commonwealth*, 109 *Va.* 800, 63 *S. E.* 464, the evidence was held insufficient to show that the wife was in destitute or necessitous circumstances, and the question of support by others and of the construction of the statute were not even touched upon.

Nevertheless, these cases were cited in the case of *State v. Bess*, 44 *Utah*, 39, 137 *Pac.* 829, to sustain a mere dictum supporting

the so-called humane construction. An examination shows that the suggestions of the court in *State v. Bess* amount to obiter, for in that case the judgment of conviction was reversed and in addition the court found that "even under the construction of the statute as contended for by defendant, the children involved were in destitute circumstances," and the court further said:

"In criminal proceedings, it must be established by the evidence beyond a reasonable doubt that the children were in destitute and necessitous circumstances and that the defendant without just excuse wilfully neglected and refused to provide for their support, before the defendant can be legally convicted."

It is admitted that the Georgia statute is not exactly like our own, but in the following cases, the question whether the father is guilty if he fails to provide for his child after the separation, even though the child may be abundantly supplied with all necessaries of life, was considered and the courts held that the father cannot be convicted unless it be shown that the child was not only dependent, but in a destitute condition. *Dalton v. State*, 118 *Ga.* 196, 44 *S. E.* 977; *Baldwin v. State*, 118 *Ga.* 328, 45 *S. E.* 399; *Williams v. State*, 121 *Ga.* 195, 48 *S. E.* 938; *Mays v. State*, 123 *Ga.* 507, 51 *S. E.* 503; *Williams v. State*, 126 *Ga.* 637, 55 *S. E.* 480; See, also, *State v. Fuller*, 142 *Iowa*, 598, 121 *N. W.* 3; *People v. Selby*, 26 *Cal. App.* 796, 148 *Pac.* 807; *State v. Tietz*, 186 *Mo. App.* 672, 172 *S. W.* 474; *State v. Thornton*, 232 *Mo.* 298, 134 *S. W.* 519, 32 *L. R. A.* (*N. S.*) 841.

The case of *Richie v. Commonwealth*, 23 *Ky. Law Rep.* 1237, 64 *S. W.* 979, was called to the attention of the court at the last argument, because the trial judge there proceeded upon the idea that the mere failure to provide for the support of a child under six years of age rendered the defendant liable to the penalty denounced by the statute. The Supreme Court held that the crime denounced by the statute was not simply the permanent and wilful desertion of a child under six years of age, but that such desertion must be under circumstances that endanger its life or health; for instance, by leaving it alone to starve or freeze or exposing it to some contagious disease. *Gedney v. Day*, 44 *N. J. Law*, 576; *State v. Coolidge*, 72 *Wash.* 42, 129 *Pac.* 1088.

Re-argument.

It is respectfully submitted that the rule laid down in the case of *State v. Thornton*, 232 *Mo.* 298, 134 *S. W.* 519, 32 *L. R. A.* (*N. S.*) 841, is the correct rule. The statute under consideration is a penal statute, prescribing a severe penalty. Such a statute must be strictly construed and it is not within the province of the court to disregard any word or phrase or the natural and ordinary meaning of such word or phrase. A child which is being supplied with necessary food, clothing, shelter and education by its grandparents cannot be said to be in either destitute or necessitous circumstances.

It is respectfully submitted that the judgment below should be reversed.

RE-ARGUMENT OF THE DEPUTY ATTORNEY GENERAL FOR THE STATE.

The application of the doctrine of *ejusdem generis* to the constitutional provision in question is now, as it was before, opposed. The general words in the statute involved in the *Hull Case* were: "Any such place of public amusement." Whereas the word "such" as used in our Constitution is used jointly with "as" in lieu of the pronoun "which".

In order to prevent the application of the rule of *ejusdem generis* as laid down in the case of *State v. Eckhardt*, 232 *Mo.* 49, 153 *S. W.* 321, plaintiff in error draws the following four conclusions: (1) the misdemeanors specified in the Constitution are all punishable by summary convictions at common law. (2) The misdemeanors specified in the Constitution are all "petty" misdemeanors. (3) The misdemeanors specified in the Constitution are all punishable by fine or imprisonment, or both. (4) The misdemeanors specified in the Constitution are all common law offenses.

Carrying concealed a deadly weapon is not an old crime, let alone a common law one, and is a very different crime from that of 2 *Edward* III, *Chapter* 3.

The term "petty" misdemeanor is not a phrase of technical significance as are the terms "felony" and "misdemeanor" even though the term "petty" may have been used by eminent persons as descriptive of a class of crimes spoken of in the same way as

a person might today speak of the larceny of a loaf of bread in this state as a petty larceny, but in the definition of crime, it has no place.

There may be relatively insignificant assaults and batteries as there may be relatively insignificant larcenies and embezzlements and other crimes.

The crime of carrying concealed a deadly weapon was not so great in 1897, but it may now be punished by imprisonment up to seven years and is frequently punished by imprisonment of a year or upwards, and it cannot be called a "petty crime."

If the contention of the plaintiff in error is sound, the increased punishment of the crime translates it to a higher "genus" of crime and it ceases to be a "petty" misdemeanor; it no longer belongs to the "genus" necessary for the purpose of evoking the *general* rule of *ejusdem generis*.

It is contended that all the specified crimes have a common feature of punishment, by a fine and imprisonment which it is maintained does not exist in the Non-Support Act. The support required of a parent is not without its feature of punishment as is the restitution money ordered in every judgment in larceny; for it may very well be regarded as a fine paid in installments for the benefit of the injured citizen.

The constitutional convention cannot be presumed to have had any such thought in mind as a limitation upon "such other misdemeanors" when they drafted this section, carefully inserting as they did a provision whereby no matter how severe the penalty might be or whatever its nature if more than one month's imprisonment or one hundred dollars fine, there should be an appeal.

The matter treated of by the plaintiff in error under head of "If appeals to the Court of General Sessions are to be founded upon the law and practice of appeals to the Superior Court from justice of the peace, the judgment of the Court of General Sessions must be either reversed or corrected," makes very little difference in principle one way or the other as this honorable court will enter correct and final judgment in this proceeding.

The judgment as pronounced by the Court of General Ses-

sions is its judgment, it is its *de novo* judgment, rendered *de novo*. And it is submitted that it should be sustained.

The matter treated of by the plaintiff in error under the head of "The Court of General Sessions erred in its rulings of the testimony pertaining to physical violence" is new to the application for a rehearing.

This matter was not discussed by the plaintiff in error at the first argument in this court, nor was it treated of in his brief.

It is entirely too late to raise and discuss questions that were abandoned at the previous argument.

The admission of the testimony in behalf of the state as to physical violence went in without objection and it is submitted that now, on a rehearing of this case, *after* omission to make objection to the testimony as it originally went in; *after* omission to reserve a right to strike out; *after* omission to note exception to the admission of testimony of physical violence; *after* omission to argue the question when the case came regularly before the Supreme Court under the usual rule, *he speaks too late*.

As to the other matters treated of in the brief of the plaintiff in error, it is doubtful whether anything can be added to the former brief on these subjects and the previous oral argument or the reasons and authority already given by the court in its opinion.

It is respectfully submitted that the decision of the court is correct and should not be modified.

Brief of Counsel for the Plaintiff in Error in Reply to Brief in Behalf of State of Delaware upon Rehearing.

The contention is made that the doctrine of *ejusdem generis* is inapplicable because of certain apparent differences existing between the misdemeanors specified in *Article* 4, § 30, *of the Constitution*.

The learned Attorney General admits that the doctrine of necessity must have been applied in the *Hull Case*, 18 *Idaho*, 475, 110 *Pac*. 256, 30 *L. R. A.* (*N. S.*) 465, because certain general words were used in the statute there construed.

The cases cited for the plaintiff in error show that the rule is applicable *wherever* and *whenever* specific words are followed

by general words of description, unless no genus exists and the
cases likewise show that the courts assume that the draftsman
did not intend to give the general words their full and unqualified
significance, for in such case he would have made no mention of
the specific things in mind.

The state contends that carrying concealed a deadly weapon
is a very different crime from that of 2 *Edward* III, *Chapter* 3,
which forbade the going around armed with dangerous and unusual
weapons, to the terror of the people.

Carrying concealed a deadly weapon is but one form of com-
mitting the old common law offenses, and it has been held that
the statute of 2 *Edward* III, *Chapter* 3, was but an affirmative
of the common law offenses. *Knight's Case* 3. *Mod.* 117, 87 *Eng.
Reprint*, 75; 40 *Cyc.* 853, and cases cited.

The learned Attorney General argues that because assaults
and batteries may be aggravated and because the punishment
for carrying concealed a deadly weapon has now been made most
severe, therefore, the framers of the Constitution must have had
aggravated assaults and severe penalties in mind.

At the time of the adoption of the Constitution the express
provision with regard to assaults and batteries was as follows:

"Every justice of the peace may punish by fine, not exceeding ten dollars,
all assaults and batteries, and other breaches of the peace punishable by any
law of the state, when the offense is not of a high or aggravated nature. * * * *"
     *Code* (1852), § 2013; *Rev. Code* 1915, § 3957.

With regard to carrying concealed a deadly weapon, the pro-
vision at the time of the adoption of the Constitution was as
follows:

"That if any person shall carry concealed a deadly weapon   *   *   *
such person shall, upon conviction thereof, be fined not less than twenty-five
[dollars] nor more than one hundred dollars, or imprisoned in the county jail
for not less than ten nor more than thirty days, or both at the discretion of
the court.   *   *   *"  *Laws of Del. Vol.* 16, *c.* 548, *p.* 716.

In 1909, the maximum fine was increased to two hundred
dollars and the maximum imprisonment was increased to six
months. *Laws of Del. Vol.* 25 *Chapter* 252, *p.* 555.

It was not until the last session of the General Assembly

Re-argument.

that the maximum fine was increased to two thousand dollars and the maximum imprisonment to seven years. *Laws of Del. Vol.* 28, *Chapter* 244, *p.* 686.

In other words, it is the contention of the state in this case, that the framers of the Constitution could not have had "petty" misdemeanors in mind, because the General Assembly has since increased the penalties for one or more of those misdemeanors to such an extent that the misdemeanors can no longer be considered "petty".

The framers of the Constitution said to the General Assembly, You may by law give to any inferior courts jurisdiction of certain offenses now defined and punished by the statutes of this state, which offenses were all punishable by inferior courts at common law; which offenses are now all petty misdemeanors; which offenses are all punishable by fine or imprisonment, or both; and which offenses were all common law offenses; and you may give to the said inferior courts jurisdiction of other misdemeanors *ejusdem generis;* provided, however, that if the said inferior courts impose imprisonment exceeding one month or a fine exceeding one hundred dollars, we will give an appeal to the Court of General Sessions.

The framers of the Constitution did not say to the General Assembly, You may give to any inferior courts jurisdiction of any or all misdemeanors, whether punishable by summary convictions at common law or no; whether petty or no; whether punishable by fine or imprisonment, or no; and we have simply specified a few of them for your convenience; you may take those specified, alter the punishments now provided for them, increase the fines and imprisonment to such a degree that instead of being misdemeanors, the offenses would have been felonies at common law; you may add penalties which consist of neither fine nor imprisonment, and in general you may do exactly what you please. We simply suggest a few things that happen to occur to us.

Recognizing the fact that all the misdemeanors specified in the Constitution are punishable either by fine, or imprisonment, or both, and further recognizing that the framers of the Constitution must have had only such punishments in mind because they provided an appeal only where such punishments were inflicted,

the state would contend that the enforcement of a civil obligation provided for by the Non-Support Act is nevertheless a fine.

In many states it is provided either by Constitution or by statute that fines shall be devoted to a certain public purpose and shall not be diverted therefrom to private uses. *State v. Gilmore*, 88 *Kan.* 835, 129 *Pac.* 1123, 47 *L. R. A.* (*N. S.*) 217.

The state has failed to show that the doctrine of *ejusdem generis* is inapplicable to the article of the Constitution under construction.

At the rehearing it was suggested by the court that the provisions of the bastardy act were more or less like those of the Non-Support Act; that jurisdiction under the former act had long been given to justices of the peace; and that if the contentions of counsel for the plaintiff in error were correct, such jurisiction was contrary to *Article* 4, §30, *of the Constitution*. The answers to such an inference are: (1) The bastardy act does not purport to prescribe or define any misdemeanor. *Rev. Code*, § 3072 *et seq.* (2) The bastardy act prescribes neither fine nor imprisonment for the punishment of any criminal offense *qua* offense. (3) Proceedings to provide for the support of bastard children are by the weight of authority declared to be in the nature of civil proceedings. 1 *Enc.* of *Pl.* & *Pr.* 267, and cases cited; 5 *Cyc.* 644, and cases cited. In this state bastardy proceedings are regarded as only *quasi* criminal. *Smith v. State*, 1 *Houst. Cr. Cas.* 107.

It is respectfully submitted, therefore, that jurisdiction in bastardy cases does not depend upon and has no connection with *Article* 4, § 30, *of the Constitution*, which provides for certain "criminal matters," plainly "misdemeanors" and punishable by "fine or imprisonment, or both."

The state has not answered the contention of counsel for the plaintiff in error that, if appeals to the Court of General Sessions are to be founded upon the law and practice of appeals to the Superior Court from justices of the peace, the judgment of the Court of General Sessions must be either reversed or corrected.

The learned Attorney General has been unable to find any

Re-argument.

answer to the contention of the plaintiff in error that the information in the Municipal Court was fatally defective for want of the name of the injured party.          \

When the original brief of counsel for the plaintiff in error was prepared, it seemed to him contrary to all authority that the alleged physical violence would be considered by the Supreme Court on *certiorari*, and counsel for the plaintiff in error could not foresee that the learned Attorney General would step out of the record to argue the case upon its supposed merits.

It is respectfully submitted, therefore, that the present contention of counsel for the plaintiff in error does not come too late, and that the Supreme Court must either disregard the merits of the case in arriving at its conclusion or it must reverse the judgment of the Court of General Sessions, because the merits do not and can not appear upon the record under the rulings of the court below.

Counsel for the plaintiff in error confronts the state with a clear dilemma, and counsel neither concedes nor denies, expressly or impliedly, that either horn of the dilemma is correct.   He simply submits that both cannot be right, and that the learned court below could not hold evidence of physical violence admissible and material and then hold it not subject to contradiction or cross examination.

The learned Attorney General, after having asked the court to overrule all technical objections in this case, now insists upon certain technical rules with regard to exceptions to the evidence. It is true that an objection must be positive, not hypothetical or contingent, and it cannot be reserved or postponed unless it is not practicable for the opponent to know whether there is ground for objection.   The test is whether he, at the time of the offer, knows or could know the grounds.   If he does, his decision must be absolute, not contingent.   1 *Wigmore on Evidence*, §18b.

In the present case counsel for the plaintiff in error could not know that testimony was objectionable when the court itself said, "We cannot tell whether it is relevant until we hear it;" but when the court had heard it and had deemed it relevant and then refused to permit cross examination upon it, it was clearly

the right moment for an objection to the ruling of the court and an exception thereon, In fact an objecting opponent is not always entitled to an immediate and final ruling, but when a ruling has been made, his exception goes to the whole matter.

The learned Attorney General makes no answer to the contention of counsel for the plaintiff in error that the two cases which may be regarded as authority for the so-called "humane construction" are counterbalanced both in logic and in weight by many other authorities and that the reasoning in those cases was drawn from cases where the statute contained no qualifying phrase whatsoever.

CURTIS, CH. (PENNEWILL, C. J., concurring, except upon one point appearing in his opinion hereafter):—

In this case a reargument was had on the application of the plaintiff in error, and the views of the majority of the court as to the final result have not been changed thereby, notwithstanding the forcible and earnest argument of the counsel for the plaintiff in error.

It is easier to state the rule of *ejusdem generis* than to apply it, for its application is based on the finding clearly a genus. As already stated, this court does not find in the several misdemeanors stated in the Constitution a genus. It has been strenuously argued that there is a genus, consisting of four characteristics common to all of the misdemeanors mentioned in the constitutional provision, and that the misdemeanor under consideration lacks these common characteristics. These characteristics were thus stated by counsel for the plaintiff in error: The misdemeanors specified in the Constitution are all (1) punishable by summary convictions at common law; (2) petty misdemeanors; (3) punishable by fine or imprisonment, or both; and (4) common law offenses.

As pointed out clearly by the Deputy Attorney General, in his supplemental brief, the first and fourth characteristics are not found in all of the crimes mentioned in the Constitution, for the crime of carrying concealed a deadly weapon is not a common law offense, and has not been a crime in this state until made so in 1881. But even if the constitutional misdemeanors had

all of these characteristics and the misdemeanor named in the
Non-Support Act does not contain all of them, it is not to be
assumed that the framers of the Constitution meant to restrict
the General Assembly from giving to any inferior court, or jus-
tices of the peace, jurisdiction of a misdemeanor which did not
possess all of the characteristics. The jurisdiction certainly
was not restricted to common law offenses.

The most reasonable view on this point is, that the juris-
diction of such inferior courts was limited to those criminal and
*quasi* criminal matters punishable and enforceable after summary
conviction as had been, or could reasonably be, conferred in this
state on inferior courts, or on justices of the peace. At the time
of the adoption of this Constitution there was vested in the justices
of the peace jurisdiction of a criminal or *quasi* criminal matter
substantially like that named in the Non-Support Act. There-
fore it is not a violation of the restrictions of the Constitution
to confer upon an inferior court jurisdiction of the matters con-
tained in the Non-Support Act. Since the act passed in 1829,
jurisdiction of bastardy proceedings has been vested in justices
of the peace, and the purpose and machinery of that act is sub-
stantially similar to those of the Non-Support Act. Both enforce
duties of parents for the support of their children, permit summary
convictions, and are enforced by requiring the giving of bonds
for support, and commitments to jail in default of a bond, with
an appeal to obtain a trial by jury. It is a fair assumption that
the framers of the Constitution of 1897 had in mind this bastardy
proceeding as an illustration of the kind of summary proceeding
which experience of many years had shown could be safely com-
mitted to inferior courts, and even to justices of the peace, and
the Non-Support Act being in its purpose and methods so similar
to the ancient proceeding to compel the father of an illegitimate
child to support his offspring may safely be considered to be well
within the intent of the makers of the present Constitution.
It was not necessary, of course, to include in the Constitution
either of 1831 or 1897 mention of the bastardy proceeding as one
of the criminal matters which could be conferred on inferior
courts, because that jurisdiction had already been conferred on

34

justices of the peace. For the additional reasons here set forth, the conclusion as to the constitutional validity of the Non-support Act is supported.

(16) There was no error in the admission or rejection of testimony relating to the marital relations between the plaintiff in error and his wife, for any such testimony whether admitted or rejected was immaterial and irrelevant. For the purposes of this case it does not matter whether the father of the child used personal violence towards his wife or not, or whether she was afraid to live with him or not, or whether he really wanted her to live with him. It was his duty to support his child if he was financially able to do so, provided the child was in destitute and necessitous circumstances, even though the wife without sufficient excuse refused to live with him. We do not say that he could have been compelled to support his wife in such a case, but surely a little child could not be held responsible for the acts of the mother. Under the non-support law preceding the present statute, the court uniformly held that "until legally separated, a man is bound to support his wife. If she be a woman unfit to live with, the husband's remedy is to obtain a divorce." *State v. Tierney*, 1 *Pennewill* 116, 39 *Atl.* 774.

The former statute was not as criminal in its character as the present one, but it was more criminal than civil, and contained the words "without reasonable cause," which are practically the same as "without lawful excuse." It was the law of this state, therefore, that the misconduct of the wife could never be a lawful excuse for the husband's failure to support her. It is not necessary to go so far in the present case, and it is possible the court might not do so, in view of the character of the statute and the greater necessity for construing it strictly. But it can and should be held that the separation of the father and mother, no matter through which one's fault, is not a lawful excuse for the father's refusal to support a young child in destitute and necessitous circumstances within the meaning of the statute. Such, as we understand the record, was the position taken by the Court of General Sessions in the determination of this case, and in our opinion it was the correct one.

It has been urged that such a construction of the statute eliminates, or disregards entirely the words "without lawful excuse." It is contended that those words mean something, and if a wife's refusal, without just cause, to live with her husband does not excuse him from supporting her, and a child in her custody, then the words are meaningless. The same reasoning was often unsuccessfully urged upon the court in cases arising under the former non-support law. But without regard to the decisions in those cases, we do not concede, and it has never been conceded that the words "without lawful excuse" are meaningless. Indeed it is not difficult to conceive of a case in which they might apply and be given full meaning and effect. The financial inability of the father to support his child would be a lawful excuse for non-support. The independent means of the child, in connection with the limited means of the father, might likewise be a lawful excuse. And perhaps the independent and adequate means of the wife who without just cause separates herself and her young child from her husband, would be a lawful excuse for his refusal to support the child. The desire of the grandparent to have the custody of the child, with an assumption of the legal liability to support it, might also furnish sufficient excuse for the father to refuse to support the child who is supplied with the necessaries of life. Other cases or instances no doubt could be mentioned in which the words employed in the statute might very well apply and be given the meaning and effect intended by the legislature.

But we entirely agree with the court below in holding that the mere refusal of a wife to live with her husband, even though she had no just cause to leave him, does not furnish him a lawful excuse to support a child she takes with her. If her conduct after leaving is so flagrant and wicked as to make her an unfit person to keep and raise the child, the father may in a proper proceeding recover its custody if he be a proper person to have it. Such however, is not the present case.

It should be borne in mind that the question in this case is not whether the wife had a lawful excuse for leaving her husband, but whether the latter had a lawful excuse for refusing

to support the child.  The two questions are wholly dissimilar, and the former is in our opinion entirely immaterial in this case. We think some confusion has been caused in the discussion of the case by treating both questions as material and in effect similar.

But it is also true that if the mother of an infant of tender years refuses to live with her husband, the father of the child, because she has suffered personal violence at the hands of her husband and fears on that account to go to live with him, her refusal under such circumstances is not a lawful excuse for the failure of the father to support the child.  It was not error, therefore, for the court below to refuse to strike out all testimony as to the martial relations of the parents, as that testimony had a bearing on the question of personal violence.  Whether the court relied on the general principle above alluded to, or on the evidence respecting the wife's fear of personal violence, does not appear, for no opinion or statement was filed in the court below, and it is not important to find the exact basis of their conclusion if there be some evidence respecting both points of view.

With respect to the rulings of the court below as to the admission of evidence, it is not correct, as stated by the counsel for the plaintiff in error, that the court excluded any testimony offered by the plaintiff in error which would show there was no personal violence, or to show that the husband and wife were on friendly terms.  Therefore, there is no assignment of error based on the admission or rejection of testimony which warrants a reversal of the finding of the court below.

(17) The seventeenth assignment of error was the refusal of the court to permit the wife of the plaintiff in error to answer this question, put to her at the trial: "Are you willing to take your child to your husband and live with him in a home provided by him?"  Whether the question be answered in the affirmative or negative does not tend to prove or disprove the charge made on the information in the Municipal Court that the plaintiff in error had failed to support his minor child.  The only bearing it would have would be on the future support of the child, which was not the issue.  Any order for the support of the child was by the act made subject to change by the court, and was based on the circum-

stances, the financial ability or earning capacity of the plaintiff in error. A reconciliation of the parents and their cohabitation might be a reason to change the order, but would not necessarily absolve him of guilt for his completed offense stated in the act. There was, therefore, no error in the refusal of the court to admit the evidence referred to in the seventeenth assignment of error.

(18, 19) The procedure in the Court of General Sessions on appeal from the Municipal Court in entering there a new judgment based on the evidence produced at the hearing of the appeal, was entirely correct. On the appeal the case was heard *de novo*, not on the testimony taken in the Municipal Court, for there was not, and could not be, a record of it for transmission to the appellate tribunal, but on the testimony produced before the appellate court. Therefore, the judgment on the appeal was a new one, viz., the judgment of the Court of General Sessions, and that court was not limited to an affirmance or reversal of the judgment of the Municipal Court. It had a right to enter a different judgment from that of the lower court, including changes in the sentence and the provision for enforcing support for the child, and could rightly require the father to provide such support from a period anterior to the entry of its judgment, viz., from the time of the judgment in the Municipal Court. On this writ of *certiorari* this court finds whether the record does or does not contain error; and if it does contain error, grants a new trial, or orders a correction of the judgment; and if it does not find error, simply affirms the judgment and by a mandate remits the case to the Court of General Sessions for such further proceeding therein as would have been proper if there has been no writ of error in this court. There is no error in the record based on the manner of the entry of the judgment in the Court of General Sessions.

After consideration of the cases cited on the subject, we adhere to our interpretation of the phrase "in destitute or necessitous circumstances," contained in the act. As stated by counsel for the plaintiff in error, there are two lines of cases as to the liabilities of a parent towards the maintenance of his offspring; the one holding that a child may be in destitute and necessitous

circumstances though its wants be amply supplied by relatives or friends; the other holding that actual destitution or necessitous circumstances must exist. The statutes construed in the cases vary much, and we still find, as stated in the opinion first filed in the cause, and for the reasons there stated, that the view there expressed is the correct as well as the salutary one. Our conclusions are necessarily based on the Delaware statute, and upon our conviction as to the purpose and scope thereof, and the meaning of the language used is based on such purpose and scope.

(20) The case has been considered in this court as though the evidence produced in the court below was properly made a part of the record and, therefore, reviewable. But on a *certiorari* questions of law and not of fact are reviewable. *Bailey v. Luff,* 2 *Harr.* 292. Evidence is gotten into the record of the court below by a bill of exceptions, which is not appropriate to a writ of *certiorari,* but to a writ of error. Inasmuch, however, as the record, including the testimony taken by the court below, as well as the parties, are before this court, this court has power to, and should, determine the questions raised by the assignments as if there had been a writ of error instead of a writ of *certiorari.* This course was pursued by the Court of Errors and Appeals in *Jeans v. Jeans,* 3 *Harr.* 136, where there was a writ of error when there should have been a writ of *certiorari.*

In my opinion, therefore, the judgment of the court below should be affirmed without any modification.

PENNEWILL, C. J.:—On one point I do not entirely agree with the Chancellor's opinion. It is agreed that the case was triable *de novo* in the Court of General Sessions. For that reason I think the support of the child ordered by said court should have commenced at the time the order was made and not at a time anterior thereto. The judgment was a new judgment and in my opinion should not in effect have related back. In all the trials had under the former Non-Support Act, the support began at the time of the judgment, and in no case did the court ever make its order retroactive. I think, therefore, the court below should reform its judgment to the extent that the support ordered shall begin at the time of the rendition of the judgment.

29 Del.]  Donaghy vs. State.  535

Dissenting Opinion.

Except as herein indicated, I agree with the opinion of the Chancellor.

Boyce, J., dissenting:—In order to determine whether the Municipal Court for the City of Wilmington had jurisdiction of the offense charged against the plaintiff in error, it is necessary to make a close examination of the several provisions of the Constitution, vesting judicial power in the state, with a view to ascertaining the true intention of the framers in the establishment of our judicial system. It is to be presumed that these several provisions are of the same general policy, and they should be construed in the light of each other. One of the objects in the judicial system provided for is expressed in the provision for the establishment of inferior courts of special, limited, criminal jurisdiction,—jurisdiction of the criminal matters, specifically enumerated, and of others of like or inferior grade. While the General Assembly is given power to transfer the present jurisdiction of the Court of General Sessions in any matter to other courts, as provided by the Constitution, it cannot transfer jurisdiction of criminal matters of a higher grade than the offenses specifically enumerated in *Section* 30, *Article* 4, *of the Constitution*, to any inferior court established or to be established under said section.

The doctrine of *ejusdem generis* is a rule of construction. By this rule, it is recognized that where general words follow an enumeration of persons or things of a particular and specific meaning, such general words are not to be construed in their widest extent, but are usually to be restricted to persons or things of the same class or kind with those enumerated. The rule does not require the rejection of the general words, but it does require the ascertainment of legislative intention to be gathered, as in this case, from said section 30, and the other provisions of the Constitution dealing with judicial powers; and the office of the rule is to aid in ascertaining such intention.

Generally speaking, the rule only applies where the specific words are all of the same nature, and is inapplicable where they are of different *genera*. There are many instances, however, where the general words are unaffected by connection with the

specific words, and this is so in cases where the general words are to be understood in their primary and wide meaning, and as including anything which could in any manner facilitate the plain and evident legislative purpose. But this qualification of the rule is not extended so as to class, as in this case, misdemeanors of superior grade with those of inferior grade, if there are, in fact, misdemeanors of a lower grade than those enumerated to which the general words can apply. So that the general words, "and such other misdemeanors," relied on by the state, are not to be extended to misdemeanors commonly recognized, and well understood by the framers of the Constitution, to be superior to those enumerated, but only to misdemeanors of the same general kind or inferior in grade. And this is so where the enumeration is, like as in this case, of several distinct, specific offenses, differing in specie but of the same general inferior grade. *Black on Inter. of Laws* 141; 2 *Lewis' Suth on Stat. Con.* § 437 (2d Ed.)

In this state the more important common law crimes, as well as the statutory crimes, are defined by statutes; likewise some of the smaller common law offenses, but not all 'of them; as for instance, "assaults, batteries, nuisances, and all other offenses indictable at common law, and not specially provided for by statute" (*Rev. Code* 1915, § 4720), all of the latter, though not all specifically mentioned, being misdemeanors embraced within the lesser common law offenses, "punishable by fine and imprisonment, or either, according to the discretion of the court." The offenses specifically named in the Constitution are commonly recognized as a lower grade of misdemeanors, and are such as may be, and frequently are, dealt with by summary proceedings before justices of the peace and inferior courts. In this connection, attention may very well be directed to the fact that *Section 30, Article 4*, of the present *Constitution* does not contain all of the offenses enumerated in the corresponding section of the *Constitution of* 1831; as for instance, "horse racing," "cock fighting," "shooting matches," and others, and very likely for the reason in part, at least, that they were deemed too minor to be mentioned in the fundamental law. It may also be noted that the general words in the present Constitution were not contained in the old

Constitution, and doubtless they were incorporated in the new to overcome the decision in the case of *Gray v. State*, 2 *Harr.* 77. The Legislature had previously undertaken to give to the Mayor's Court in the City of Wilmington (corresponding to the present Municipal Court of the City) jurisdiction of "all *larcenies*, assaults and batteries, *riots*, *routs*, and *unlawful assemblies*, nuisances, and *other offenses*, committed within the city, and other grant of powers not necessary to mention. Judge Harrington, in his opinion, filed in the *Gray Case*, *supra*, found that the offenses, italicised above, were not included within the class of offenses specified in the then Constitution, authorizing the establishment of inferior courts, and that therefore the grants of power were unconstitutional and void, said:

" * * * If the term 'other offenses' mentioned in the act is not to be restrained to offenses inferior in grade" [note the words 'inferior in grade'] "to those already enumerated, there is no limit to the jurisdiction of the Mayor's court over offenses committed within the city." * * * "It" [the grant intended by 'other offenses'] "is not embraced within the letter of the Constitution; it is not contemplated by its spirit or intent; it is not necessary or useful in reference to the objects for which the door was left open for the establishment of other and inferior courts; it is plainly inconsistent with the idea of an inferior court to place in the hands of a tribunal claiming to be merely a corporate franchise, exercising its function through corporate agents, not selected by nor responsible to the public at large; powers and jurisdiction equal to * * * courts deriving authority immediately from the Constitution itself."

It was held by a divided court in *State v. Churchman*, 3 *Pennewill*, 361, 51 *Atl.* 49, that the City Judge of said Municipal Court is an officer of the Municipal Corporation.

The conclusion reached by Judge Harrington applies with equal force to the present case. If "other offenses" would have the effect to carry "powers and jurisdiction equal to courts deriving authority immediately from the Constitution itself," what is there to prevent the phrase "and such other misdemeanors," construed in its widest extent, from having the same effect? It is inconceivable that the framers of the Constitution intended that the general words should have such effect, it being so plainly inconsistent with the idea of an inferior court, such as is authorized by *Section* 30, *Article* 4, of the *Constitution*.

There is a genus common to all the enumerated offenses in, at

least, two characteristics. Tested by their character, they are misdemeanors of inferior grade as already shown; and they are each punishable by fine and imprisonment, or either, according to the discretion of the court; and none of them embraces the element for the enforcement of a pecuniary liability. There is, indeed, a want of similarity between the offenses provided for by the statute in question, and those enumerated in the Constitution. The latter are *ejusdem generis* in punishment, but not so with those created by the statute; for the double purpose of the statute takes the offenses created thereby out of the genus of the misdemeanors specified. Again, among the offenses enumerated in the provision of the *Constitution of* 1831, corresponding with said *Section* 30 of the present *Constitution*, were "retailing or selling without license, wine, rum, brandy," etc., "contrary to law," as in the present Constitution, in which after the words, "without license," is incorporated "or on Sunday, or to minors." And after the words, "contrary to law," as above, there is also incorporated "carrying concealed a deadly weapon." At the time of the adoption or the present Constitution, selling liquor on Sunday, or to minors and carrying concealed a deadly weapon, were misdemeanors. If by the general words, "and such other misdemeanors," plenary power was intended to be reposed in the General Assembly to give to any inferior courts by it established or to be established, or to one or more justices of the peace, jurisdiction not only of the criminal matters enumerated, but of any other misdemeanors, whether *ejusdem generis* or not, why did the framers of the present Constitution incorporate with the offenses enumerated in the old Constitution, and retained in the new, the offenses of selling liquor on Sunday, or to minors, and of carrying concealed a deadly weapon? It does seem pertinent to inquire, why did the framers of the Constitution go to the pains of making the enumeration of specific offenses, and particularly of making the revision of the corresponding provision contained in the old Constitution? Indeed, why was the revision made, and why was there any enumeration of specific offenses, if the general words have the meaning accorded to them by the majority opinions?

I am of the opinion that the court is not driven to say that the specific misdemeanors enumerated exhaust the genus, and that there is nothing *ejusdem generis* left for the general words to operate upon; and I am also of the opinion that the framers of the Constitution did not intend to leave the jurisdiction of misdemeanors, regardless of their character, so much to the discretion of the General Assembly as that inferior courts can be vested with jurisdiction of the misdemeanors created by the statute in question, the latter clearly not being within the genus of the misdemeanors specifically mentioned, and not within the meaning of the general words following. Where the specific misdemeanors do not exhaust the whole genus of inferior misdemeanors, it is against the weight of authority in the application of the rule to apply it to a superior class. Inferior courts established under *Section 30, Article 4, of the Constitution*, are so affected by the specific offenses enumerated and the general words following therein, construed in the light of other provisions of the Constitution vesting judicial power, that the jurisdiction of such inferior courts must be limited to the offenses specifically mentioned and to misdemeanors of the same general class or inferior grade.

A bastardy proceeding is generally considered to be in the nature of a police regulation, and justices of the peace are vested with jurisdiction thereof under the police power of the state, and not by virtue of constitutional authority, as are the powers and jurisdiction of the Municipal Court. By great weight of authority, such proceedings are adjudged to be civil and not criminal in their nature. In some jurisdictions they are regarded as criminal; in others as *quasi* civil or *quasi* criminal. In this state, the proceeding is considered to be of the latter nature. *Smith v. State*, 1 *Houst. Cr. Cas.* 108; *Vail v. State*, 1 *Pennewill*, 8, 39 *Atl.* 451; and yet the proceeding is deemed to partake so much of a civil nature, that the Superior Court allowed *certiorari* to a justice of the peace on an order of filiation. *Cloud v. State*, 2 *Harr.* 361. The Non-Support Act expressly defines a crime. The bastardy act defines no crime and provides no punishment for any offense, but only for failure to comply with the order of filiation. Clearly inferior courts cannot be given jurisdiction of

criminal matters, that is of misdemeanors, the grade of which is not determined by the specific offenses enumerated. Such courts cannot be clothed with jurisdiction of civil matters or of criminal statutes primarily aimed at the enforcement of civil liabilities. So that the emphasis laid upon the similarity of the Non-Support Act to that of the bastardy act is of little or no help in determining the question before this court. The assumption that the framers of the present Constitution had in mind bastardy proceedings as an illustration of the kind of summary proceedings which experience of many years had shown could be safely committed to inferior courts, does not seem well founded.

The office of the common law writ of *certiorari*, is to bring before the court for inspection the record of the inferior tribunal, for the purpose of reviewing questions of law and not of fact. The supervisory powers of the court on *certiorari* should not be confounded with its appellate jurisdiction. The writ has never been used to inquire into the merits of the case on the facts. In *Bailey v. Luff*, 2 *Harr.* 292, it was said:

"But on a certiorari the court may reverse for want of jurisdiction, for not proceeding in the manner the law directs, and perhaps for admitting and deciding on illegal evidence alone, if this appears."

The exceptions in this case are specifically addressed to errors of law,—jurisdiction, procedure, pleadings, and the judgment, including exceptions made to the admission and rejection of certain testimony. Though the record sent up includes the evidence adduced in the trial below, yet it is not a matter properly for review, and should not be reviewed, by this court on *certiorari*. But since the majority of the court have gone beyond the exceptions to the record and have considered the evidence on its merits, as they find it, I may be warranted in making the following comments.

I cannot agree that there was evidence to warrant the court below in finding (and certainly there is nothing in the record to show that they did find) that fear of personal violence deterred the wife of the plaintiff in error from accepting his offer to make a home for her after the separation. There is enough in the record

to warrant the conclusion, however, that other causes keep the plaintiff in error and his wife apart. Be that as it may, the subsequent friendly conversations and friendly letters between the husband and wife, and their going to Philadelphia, and being there together, at least once after separation, clearly negative any idea of real fear on the part of the wife of her husband.

Without intending any reflectoin on the wife, it is pertinent to say, in this connection, that there is nothing in the record, or in any rule of law, which does not entitle the testimony of the husband to the same degree of weight and credibility as that to be given to the testimony of the wife. The husband denied the act of violence testified to by his wife, and her testimony like his, is uncorroborated, though the wife testified that her mother was present when the alleged act of violence was committed.

Counsel for the plaintiff in error objected to the question asked the wife in her direct examination, viz.: "Did you have any trouble with your husband there?" The Court suggested: "We can't tell whether it is relevant until we hear it." The question and others following, similar in character, led the witness to detail some domestic difficulties; the occasion of her separation from her husband; her return to the home of her parents with her child, where she continues to live; and the support of the child by its grandfather. The remark of the court respecting the question above, reasonably applied to the questions following, and it carried with it the reservation of the right of the plaintiff in error to renew his motion to strike out the testimony after its admission, and particularly so on learning that he would not be permitted to cross examine the wife on the matters testified to by her, except for the purpose of attacking her credibility. The motion to strike out was properly made, and should have been allowed.

If it was competent for the wife in her direct examination to give testimony relating to the marital relations between her and her husband, including other matters testified to by her, it was equally competent to examine her concerning the same on cross examination. It is manifest from the record that if the examination in chief was relevant, then the rejected questions

on cross examination were also relevant.   The exception of the plaintiff in error in this connection is to the effect that because of the several rulings made by the court below, during the cross examination of the wife as well as during the progress of the trial, to which exceptions were taken, full opportunity was not afforded the plaintiff in error to show that he was not "without lawful excuse" for not supporting his child; and that the child was not "in destitute or necessitous circumstances" within the meaning of the statute; and the plaintiff in error is sustained in his position in that the phrases "without lawful excuse" and "in destitute or necessitous circumstances" are words in the statute of legis- lative intent and meaning.   I cannot, therefore, accept the inter- pretation of the phrase "in destitute or necessitous circumstances," contained in the majority opinion, as correct or salutary; and it has not the support of the better considered cases.

It is manifest from the record that the court below, (1) did not consider the separation between the husband and wife, what- ever the cause, to be a lawful excuse for the neglect or refusal of the father to support his child; and (2) found that as the father was not supporting the child, it was in destitute or necessitous circumstances within the meaning of the act, though it had been and is properly supported by its grandparents.   Whether the wife was, or was not, justified in leaving her husband and in returning to her parents, taking the child with her, did not impress the court as important, for the reason that the child could not help the difficulties between its parents; nor likewise, did the fact that the child was supplied with necessary food, clothing and shelter by its grandparents, weigh with the court.

The court regarding the father legally liable for the support and maintenance of his child, regardless of the fact of the separa- tion existing between its parents, or the cause thereof, considered that the father was criminally liable under the statute.   True it is, the child has no separate property or income, neither has the mother; so far as appears from the record.   The grandfather's ability to support the child is not denied.   Nor is there any sug- gestion in the record of his inability or unwillingness to do so. It is clearly shown that the child is not in need of any necessary

food, clothing or lodging, and it does not appear that it will be so long as it shall remain with its grandparents. As between the grandfather and the father of the child, there may be a legal liability on the part of the father to the grandfather for reasonable necessaries supplied the child. But is the father criminally liable? The statute creating the offense charged against the father contains certain clear, specific elements of the offense. Shall these descriptive words of the offense, necessary to be alleged, and proved, be disregarded on the proofs to the extent that it is not necessary to show every essential ingredient of the offense? If the Legislature meant that the words "without lawful excuse" and "in destitute or necessitous circumstances" were not intended to be matters of description of the offense, it is fair to assume that they would have omitted them, and simply made "neglect or refusal of the father or mother to support his or her child or children" a criminal offense. The offense charged is not expressed in such barren terms, but it includes words of description which cannot and should not in a criminal prosecution be ignored. There should be no conviction in a prosecution under the statute, if it should be shown that a wife unreasonably and without legal justification refuses to live with her husband, and goes home to her parents taking her child with her, with their consent and approbation; and if, in addition thereto, it should be shown that the grandparents are not only able, but are willing and desirous, of keeping and supporting the child. Under such circumstances the father would not be without lawful excuse and the child would not be in destitute or necessitous circumstances within the meaning of the act. In ruling as the court below did, on the cross examination of the wife, there was disclosed an interpretation of the statute which had the effect to deny the plaintiff in error of any defense within the purpose and meaning of the words, "without lawful excuse," or "in destitute or necessitous circumstances." And within the legislative purpose of these phrases, the record clearly shows that the state did not sustain by proofs the necessary and essential elements contained in the information filed, and a conviction of the plaintiff in error was not warranted.

The order for support, after the verdict of guilty, can have

effect only from the date of the verdict, and the court cannot enter an order for support from a period anterior to the entry of the verdict. Since the majority of the court affirms the judgment of conviction, I concur with the Chief Justice in his opinion to the effect that the order made in this case should have commenced from the date thereof, and that the court below should reform its order accordingly.

The case of *State v. Tierney*, 1 *Pennewill*, 116, 39 *Atl.* 774, has generally, but not uniformly, been followed and particularly so in cases where the husband is willing and desirous of having his wife return to and live with him; but she, apparently without just cause, refuses to do so.

I am able to concur with the majority opinion in that, in non-support cases, "it has never been conceded that the words 'without lawful excuse' are meaningless"; and the illustrations of cases in which they might be given effect are apt, but they are not exclusive of the facts of this case.

I am for the reversal of the conviction for the reasons assigned.

The judgment entered in this court was that there was no error in the record of the court below, other than in the order requiring the plaintiff in error to pay for the support and maintenance of his child from a time anterior to the entry of the order, and the cause was remanded to the court below to reform the order in accordance with the judgment of this court.